W. CLEVE STOKES, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 30929, 31148, 31657, 33800. Filed May 27, 1954.

[1] The following proceedings are consolidated herewith: W. Cleve Stokes and Alice Hill Pye Stokes, Docket No. 31148; W. Cleve Stokes and Alice Hill Stokes, Docket No. 31657; Alice Hill Pye Stokes, Transferee, Docket No. 33800.

*Hugh R. Dowling, Esq.*, for the petitioners.
*Arthur L. Nims, Esq.*, and *J. Frost Walker, Esq.*, for the respondent.

OPINION.

BLACK, *Judge:* Some of the major issues originally raised in these proceedings have been settled by stipulation and will be given effect under Rule 50. The remaining questions before the Court are the following: (1) Was it proper for petitioners to deduct the full cost of the nursery plants and shrubs in the year purchased or should those costs be deducted as "cost of goods sold" to the extent of 50 per cent of the sales price as determined by respondent, and (2) to what extent is Alice Hill Stokes liable as a transferee of the assets of W. Cleve Stokes for taxes and penalties for the years 1946, 1947, and 1948?

A preliminary issue which was raised by the pleadings and at the hearing concerns the validity of the deficiency notice upon which Docket No. 31657 is based. Respondent contends that the language of section 272 (f) of the Internal Revenue Code referring to the making of jeopardy assessment permits the issuance of a second notice. Petitioners pleaded that the Commissioner is prohibited by section 272 (f) from issuing more than one deficiency notice in respect to the same taxable year and they still insist upon the correctness of this position in their brief.

Concededly, if the Commissioner merely determines an additional deficiency to be due after a petition to the Tax Court has been filed from the original notice, the Commissioner is limited to assertion of the increased deficiency by means of affirmative allegations in his

answer. However, where a jeopardy assessment is involved, section 273 (b) requires that a notice be mailed within 60 days after the making of the assessment, if the assessment is made before any notice in respect of the tax to which the jeopardy assessment relates has been mailed under section 272 (a). And here, no notice had previously been mailed with respect to the tax liability to which the second assessment related.

The two exceptions contained in section 272 (f), referred to above (a third exception relates to fraud), are stated in the disjunctive, indicating that the Commissioner is required to follow dissimilar methods of procedure, depending upon whether he is merely asserting an increased deficiency or is making a jeopardy assessment. It would appear that the Commissioner was authorized to make the second assessment in the instant case since section 273 (c) permits him to make a jeopardy assessment "in respect of a deficiency greater * * * than that notice of which has been mailed to the taxpayer, despite the provisions of section 272 (f) prohibiting the determination of additional deficiencies, and whether or not the taxpayer has theretofore filed a petition with the [Tax Court]." Since the Commissioner was authorized to make the second jeopardy assessment in the instant case, he was required to send a second notice subsequent to the making of the second assessment. Had he failed to do so, we think that under the decisions of this Court the assessment would have been rendered invalid. Cf. *J. H. Reese*, 15 B. T. A. 1261, appeal dismissed (C. A. 5, February 14, 1930). The second notice was thus, in fact, mandatory by statute.

But even if we are wrong in the above holding and the deficiency notice issued in Docket No. 31657 was invalid, the Commissioner was permitted, upon a timely motion filed at the hearing, to amend his answers in the other docket numbers and affirmatively ask for increases in the deficiencies which correspond to those which he determined in Docket No. 31657. It is true, of course, that where the Commissioner amends his answer and affirmatively pleads that he should be granted increased deficiencies, the burden of proof to sustain his affirmative allegations is upon him. However, in the instant case the question is not one of where the burden of proof lies. The parties have stipulated the amounts of income which petitioner W. Cleve Stokes omitted from his 1946, 1947, and 1948 returns and the amounts of income which petitioners W. Cleve Stokes and Alice Hill Stokes omitted from their joint return filed for the year 1949. This will, of course, enable a correct computation of net income for all the taxable years under Rule 50. The amounts of net income of petitioners are to be adjusted only by the net operating losses of the nursery in each of the taxable years. There again the facts have been stipulated

which will enable the determination of the operating losses of the nursery under Rule 50, depending upon our decision on Issue 1 as to how the plants purchased in each of the taxable years by the nursery should be treated in the determination of the profits or losses from the operation of the nursery.

Therefore, it seems clear to us that these matters which the parties argue so much about in their briefs will be taken care of in a computation under Rule 50.

*Issue 1.*

In the latter part of 1946, W. Cleve Stokes commenced to develop a nursery for the purpose of buying, selling, and growing camellias and azaleas. The operating losses claimed in 1946 to 1949 were, in large measure, the result of the nursery's practice of charging off as an expense deduction the entire cost of plants and shrubs purchased during a given year, regardless of the number of plants actually sold in that year.

Respondent contends that petitioners' method of accounting distorts income and is not authorized by the Code or regulations. Respondent contends that the gross profit of petitioners should be determined by deducting the cost of plants and shrubs only as "cost of goods sold," and in the absence of inventories he determined "cost of goods sold" to be 50 per cent of total sales. Petitioners contend that since its inception the nursery consistently kept its books on the cash basis and is entitled under the law and respondent's regulations for farmers to deduct the full costs of plants and shrubs purchased in the year when they were purchased. The cost of these shrubs and plants in the year of purchase is not in dispute.

Respondent argues that petitioners' nursery was more analogous to a retail store than a farm. However, Regulations 111, section 29.22 (a)–7, contains the following broad definition:

As herein used the term "farm" embraces the farm in the ordinarily accepted sense, and includes stock, dairy, poultry, fruit, and truck farms; also plantations, ranches, and all land used for farming operations. * * *

Moreover, in I. T. 1368, I–1 C. B. 72, a nurseryman is referred to as a farmer, and in O. D. 995, 5 C. B. 63, florists are treated like farmers.

Respondent has been lenient in his regulations governing the methods of accounting of farmers because of the difficulty of maintaining inventory records of growing crops and the unpredictable effect of nature. Consequently, a farmer is allowed to choose either the cash or accrual basis, his election thereby becoming binding. Regulations 111, section 29.22 (c)–6, states as follows:

Sec. 29.22 (c)–6. INVENTORIES OF LIVESTOCK RAISERS AND OTHER FARMERS.— A farmer may make his return upon an inventory basis instead of the cash receipts and disbursements basis. It is optional with the taxpayer which of these

methods of accounting is used, but, having elected one method, the option so exercised will be binding upon the taxpayer for the year for which the option is exercised and for subsequent years unless another method is authorized by the Commissioner as provided in section 29.41–2.

In I. T. 1368, I–1 C. B. 72, respondent states, in part:

While farmers may report their gross income upon the accrual basis (in which an inventory to determine profits is used) they are not permitted to inventory growing crops for the reason that the amount and value of such crops on hand at the beginning and end of the taxable year cannot be accurately determined. * * * Nurserymen may inventory their young trees only where they have reached a marketable size and stage of development and where the market value is definitely known. * * *

This ruling goes so far as to forbid nurserymen to use an inventory except in certain situations; even where allowed it is only permissible and not mandatory. In O. D. 995, 5 C. B. 63, the respondent ruled:

Florists are not required to use inventories of growing plants for the purpose of calculating their net income for income tax purposes and should not compute the cost of goods sold during the year by using an inventory value of growing plants on hand at the beginning and end of the taxable year.

It seems clear from the foregoing that petitioners in their nursery business are to be classed as farmers and had the right to use the cash basis of accounting and they did not have to secure the permission of the Commissioner to do so. They were not required to use inventories in their computation of income or losses from the nursery business. As a matter of fact, they made no attempt to keep inventories. They had none. It was their right to have none. While it is true that petitioners in their nursery business had the right to use the cash basis of accounting and not to use inventories, and to deduct in each taxable year all of their deductible expenses incurred and paid in that year, the cost of plants and shrubs purchased in that year cannot be classed as a deductible expense. That cost has to be recovered in the year when the plants and shrubs are sold.

The applicable regulation is Regulations 111, section 29.22 (a)–7, and it reads, in part, as follows:

Sec. 29.22 (a)–7. Gross Income of Farmers.—A farmer reporting on the basis of receipts and disbursements (in which no inventory to determine profits is used) shall include in his gross income for the taxable year (1) the amount of cash or the value of merchandise or other property received during the taxable year from the sale of live stock and produce which were raised during the taxable year or prior years, (2) the profits from the sale of any live stock or other items which were purchased, and (3) gross income from all other sources. *The profit from the sale of live stock or other items which were purchased after February 28, 1913, is to be ascertained by deducting the cost from the sales price in the year in which the sale occurs*, except that in the case of the sale of animals purchased as draft or work animals or solely for breeding or dairy purposes and not for resale, the profit shall be the amount of any excess of the sales price over the amount representing the difference between the cost and the depreciation

theretofore allowed (but not less than the amount allowable) in respect of such property as a deduction in computing net income. [Emphasis supplied.]

Under the foregoing regulation, when the petitioners sold plants and shrubs in any particular year, in determining their gross profit from such sales, they should have deducted from the amounts received from such sales the cost of plants and shrubs sold. This method petitioners did not follow. They should have done so. See *D. E. Alexander*, 22 T. C. 234. In the *Alexander* case, the taxpayer was engaged in the cattle business as a cattlefeeder; he purchased cattle and yearlings which he fed from 9 to 18 months and he then sold them as beef cattle. He regularly kept his books and reported his income on a cash basis. Under his method of accounting, he consistently charged off and deducted as an operating expense the cost of cattle in the year of purchase. He did not defer the cost of cattle until the year of sale. Under the foregoing facts, we held that, although the taxpayer was on a cash basis and did not use inventories, he was required nevertheless by Regulations 111, section 29.22 (a)–7, to defer deduction of the cost of cattle until the year of sale. In the *Alexander* case, we said:

Petitioner's contention that, in order to comply with the regulation, he would have to use inventories, and that the respondent, in determining the deficiencies, used reconstructed inventories, is without support in the record. As set forth in the Findings of Fact, the respondent determined the deficiencies by adjusting the amount of the deduction claimed in each of the taxable years as cost of feeder cattle. He did not compute cost of sales by using inventories. * * *

We think the same may be said in the instant case and the same regulation as was applied in the *Alexander* case, *supra*, must be applied here. Petitioners, in their nursery business, as we have already said, are to be classed as farmers and section 29.22 (a)–7 is designed to cover the computation of the gross income of farmers.

Petitioners made no attempt to prove the cost of plants and shrubs sold in any particular year. They rested their whole case on the proposition that they were entitled to deduct in each of the taxable years the entire cost of plants and shrubs purchased in that year. In our report promulgated February 26, 1954, we sustained petitioners in their contention. In this, we were in error. The cost of plants and shrubs purchased in each particular year has been stipulated and if all the plants and shrubs purchased in any given year had been sold in that year, then petitioners would be sustained. But such was not the case. Petitioners make no contention that such was the case.

Respondent in his determination of the deficiencies has purported to allow petitioners a deduction as the cost of plants and shrubs sold in the amount of 50 per cent of the sales price. In addition to this deter-

mination of the Commissioner there is some testimony in the record that petitioners, when they would purchase plants and shrubs, would use a markup of 100 per cent when they were sold. That is to say, if a shrub cost $1, it was given a price of $2 as sales price. Petitioners offered no testimony to contradict it. On the strength of this testimony we have made a finding "that of the sales made by petitioners in the nursery business in each of the taxable years 50 per cent of the amount of such gross sales represented the purchase cost of such plants and shrubs sold." In a computation under Rule 50 such figure for costs should be used. For illustration, take the year 1947. It is stipulated that the sales of the nursery in that year were $17,124.38 and that plants and shrubs purchased during that year cost $25,464.34. In computing petitioners' gross profits from the $17,124.38 sales in that year there should be deducted $8,562.19 as the cost of the plants and shrubs sold. Similar computations should be made for the other taxable years which are involved.

The amount of deductible expenses of the nursery which petitioners are entitled to deduct in each of the taxable years has been stipulated and those figures will, of course, be used in a computation under Rule 50. These deductible expenses have nothing to do with the cost of plants sold.

## Issue 2.

The second major issue involves the transferee liability of Alice Hill Stokes because of the following transfers made by W. Cleve Stokes, all of which were made without consideration, to Alice Hill Stokes:

Jan. 7, 1947___ $30,000 cash paid for real estate parcel.
Feb. 28, 1947__ 6,000 cash.
June 13, 1947__ 5,000 cash.
Nov. 9, 1948____ Stokes nursery property.
May 29, 1950___ 100 shares of stock of Union Bank and Trust Company.

Petitioner W. Cleve Stokes concedes that the foregoing transfers were made by him to his wife without consideration. He also concedes that he was insolvent when he made the transfer of the nursery property to his wife in 1948 and the 100 shares of Union Bank and Trust Company stock in 1950. He denies that he was insolvent when he made the three 1947 transfers to Alice Hill Stokes.

On January 7, 1947, there was conveyed to petitioner Alice Hill Stokes by A. P. Tyson and wife a parcel of real estate located in Montgomery, Alabama, for which the consideration of $30,000 was paid by W. Cleve Stokes. The petitioners contend that since a downpayment of $5,000 was made to Tyson in May 1946, Alice Hill Stokes received a gift of that amount in 1946. If petitioners' contention is correct she would not be liable as a transferee for the $5,000, since respondent has made no showing of insolvency on the part of W.

Cleve Stokes in 1946 and he makes no contention that Stokes was in fact insolvent in 1946. Respondent contends, however, that Alice Hill Stokes received no unconditional right to the amount in controversy until the real estate was actually conveyed to her on January 7, 1947, and on that date the full $30,000 paid for the property should be considered a transfer. On May 12, 1946, W. Cleve Stokes gave A. P. Tyson, Jr., a $5,000 binder on a piece of real property thus acquiring an inchoate interest in the property. The fact is, however, that he did nothing further until the early part of January 1947, at which time he delivered the remaining $25,000 to Tyson and caused the real estate in question to be conveyed to Alice Hill Stokes.

On numerous occasions this Court has passed on the validity of alleged inter vivos gifts. One necessary requirement is that the donor must intend absolutely and irrevocably to divest himself of the title, dominion, and control of the subject matter of the gift, *in praesenti*. *Edson* v. *Lucas*, 40 F. 2d 398. Cf. *J. D. Varnell*, 28 B. T. A. 231. Even if it be assumed, however, that Stokes made the downpayment with the idea in mind that he would eventually give the real estate to his wife, the mere act of making the downpayment is insufficient to create a valid gift *in praesenti*. As stated in the *Edson* case, *supra*, there must be a conveyance, assignment, or transfer sufficient to vest the legal title in the donee. Here, this was not done until 1947, when, in fact, the legal title was finally vested in Alice Hill Stokes. Since the transfer of the Tyson property was not a completed gift until January 7, 1947, it follows that Alice Hill Stokes received a $30,000 gift on that date.

The fair market value of the property transferred on the date of transfer must be determined to find the extent of transferee liability, if any. There is, of course, no controversy as to the value of the transfers which were made in cash. We have reviewed carefully the exhibits and testimony relating to the value of the Stokes nursery and concluded as an ultimate fact that on November 9, 1948, its fair market value was $40,000, but that from this value must be deducted the outstanding mortgage against the property. The parties stipulated that the 100 shares of Union Bank and Trust Company stock had a total value of $3,400.

A general requirement for the imposition of transferee liability is that the transferor be insolvent or thereby rendered insolvent at the time of the transfer. *Ruth Halle Rowen*, 18 T. C. 874, 881; Regs. 111, sec. 29.311–1. It has been stipulated that the transferor was solvent in 1946, and insolvent in 1948. Our inquiry, therefore, is whether when Stokes made the gifts in 1947 he was insolvent or whether he was rendered insolvent thereby and Alice Hill Stokes

is liable as transferee to the extent of the value of the gifts which her husband made to her in 1947. Under section 119 of the Code respondent has the burden of proving transferee liability.

On January 7, February 28, and June 13, 1947, the dates of the three transfers, the respondent contends that the transferor, W. Cleve Stokes, was insolvent, while petitioners contend respondent has not proved insolvency but that, on the contrary, petitioner W. Cleve Stokes was solvent in 1947 when each of the three 1947 gifts were made and that he was not rendered insolvent thereby. There is much evidence in the record introduced by both respondent and petitioner on this question as to whether Stokes was insolvent when he made these gifts to his wife in 1947 or, if not insolvent when he made the gifts, whether he was rendered insolvent thereby. We do not think it would be practical to discuss this evidence in detail for it would make this opinion much too long. We have carefully considered this evidence and have concluded that Stokes was not insolvent when he made the gifts nor was he rendered insolvent by reason of making them. We have made findings as to that effect in our Findings of Fact. At the time Stokes made the gifts he was the owner and operator of two very profitable businesses: W. Cleve Stokes Company, a partnership in which he owned a three-fourths interest, and Stokes Truck and Equipment Company, which made large profits until its contract to sell GMC trucks was canceled on or about September 1, 1947. That Stokes received large amounts of income from these two businesses in 1947 has been stipulated and it is these amounts of income which are largely responsible for the deficiencies which the Commissioner has determined against Stokes for the year 1947. It may well be, as respondent contends, that Stokes was insolvent at the end of the year 1947. That fact we do not have to determine. The three gifts which Stokes made to his wife in 1947 were all given in the first half of the year, the last one having been given June 13, 1947. Therefore, even if it is assumed that respondent has established that Stokes was insolvent on December 31, 1947, that fact would not establish that he was insolvent when the three gifts were made during the first half of 1947 nor would it establish that the making of such gifts caused Stokes to become insolvent. Therefore, our conclusion is that the Commissioner has not proved that Stokes was insolvent at the time the three 1947 gifts were made to his wife nor that he was made insolvent thereby. Cf. *Ruth Halle Rowen, supra,* third point decided therein.

As we have already said, it has been stipulated that Stokes was insolvent in 1948 when the gift of the nursery property was made and in 1950 when the gift of the bank stock was made. The only

question involved as to those gifts is as to the extent of Alice Hill Stokes' transferee liability because of these transfers to her. We have found that the value of the nursery property at the time of the gift was $40,000, less the amount of the mortgage which stood against the property at the time of the transfer. It has been stipulated that the value of the 100 shares of Union Bank and Trust Company stock was $3,400 at the time of the gift. These valuations will be used in a computation of transferee liability under Rule 50.

*Decisions will be entered under Rule 50.*