T.C. Memo. 1997-394

UNITED STATES TAX COURT

JAMES E. GRIFFIN AND KATRINA F. GRIFFIN, TRANSFEREES,
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18009-94.                    Filed August 26, 1997.

<u>Thomas J. Brown</u> and <u>Hubert R. Brown</u>, for petitioners.

<u>Michael A. Pesavento</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent asserts that petitioners, as
transferees of assets of Rodger L. Fisher, are liable for unpaid
Federal income taxes of Mr. Fisher for the taxable years 1991 and

1992, in the amount of $87,516, plus interest as provided by law.[1] Respondent determined, and petitioners concede, for the purposes of this proceeding, that Mr. Fisher's unpaid 1991 and 1992 deficiencies and additions to tax are:

| Year | Deficiency | Addition to Tax Sec. 6663 |
|------|-----------|---------------------------|
| 1991 | $52,165 | $40,865 |
| 1992 | 30,771 | 23,078 |

The issue for decision is whether petitioners are liable as the transferees of assets of Mr. Fisher under section 6901,[2] and, if so, the amount of such liability.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in Tallahassee, Florida, at the time they filed their petition. Petitioners were married to each other throughout the period relevant to this case. Mrs. Griffin and Mr. Fisher are sister and brother.

---

[1]The notice of transferee liability, issued to petitioners on July 7, 1994, determined a liability of $84,467. In an amended answer, respondent increased the amount of transferee liability asserted against petitioners to $87,516.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Mr. Fisher's Tax Liability

Mr. Fisher was employed by the Department of General Services for the State of Florida from 1985 through April 1992. Mr. Fisher's duties in this capacity included overseeing the contracts between the State of Florida and telephone carriers such as AT&T and Southern Bell, whereby these carriers would pay commissions to the State measured by the use of their services at pay telephones located on State property.

Sometime prior to June 1991, Mr. Fisher identified certain pay telephones that were not then covered under any State agency contract with the carriers. In order to receive the commissions generated by these telephones, Mr. Fisher created three fictitious entities and gave them names that sounded like legitimate State agencies, such as "Florida Transportation-Maintenance", "Florida Maintenance and Repair", and "Florida Rehabilitative Service". When the agency contracts with the carriers were negotiated in July 1991, Mr. Fisher caused separate contracts to be entered into between the fictitious entities and the carriers with respect to these telephones.

During the 8-month period beginning in August 1991, and continuing through March 1992, Mr. Fisher diverted approximately $300,000 in commissions that should have been paid to the State of Florida. The diverted commissions were paid to the three

fictitious entities and deposited into five different bank accounts.

Mr. Fisher began contemplating his scheme well before the first diversion. Mr. Fisher began taking action on his plan as early as April 17, 1991, when he leased P.O. Box 3794 in Leon County, Florida. This post office box was listed as the mailing address for several of his fictitious entities and was the address to which many of the diverted commissions were mailed.

On March 17, 1993, Mr. Fisher was found guilty by a jury in Leon County, Florida, of grand theft and official misconduct in connection with the diversion of the telephone commissions. Mr. Fisher was sentenced to imprisonment for a term of 4 years and ordered to pay restitution in the amount of $288,312.[3]

Mr. Fisher was also indicted on Federal charges based on his diversion of telephone commissions. In consideration of being allowed to plead guilty to one count of this Federal indictment, Mr. Fisher agreed to forfeit to the United States all rights, title, and interest in a 0.92-acre parcel of land and a 0.25-acre parcel of land. In order to accomplish this, Mr. Fisher secured the signatures of petitioners on a quitclaim deed dated May 9, 1994, which describes these two parcels. Mr. Fisher was then

---

[3]The Florida Department of Law Enforcement was able to recover only $30,000 out of the approximately $300,000 diverted by Mr. Fisher.

sentenced to prison for a term of 30 months to run concurrently with the sentence imposed by the State of Florida.

Mr. Fisher did not report the diverted proceeds on his Federal income tax returns for 1991 and 1992. Using a bank deposit analysis, respondent determined that Mr. Fisher failed to report income from his illegal activities of $174,789 and $118,401 for 1991 and 1992, respectively. As previously indicated, petitioners do not contest respondent's determination of deficiencies and additions to tax against Mr. Fisher.

Transfers of Real Property and Mortgage Payments

Mr. Fisher started planning the diversion of the telephone commissions prior to June 1991. On June 6, 1991, Mr. Fisher transferred to petitioners, by warranty deed, his interest in three contiguous parcels of land located at 6913 Apalachee Parkway, Tallahassee, Florida. These parcels consisted of a 2-acre parcel (parcel 1), a 0.92-acre parcel (parcel 2), and a 0.25-acre parcel (parcel 3). On the date of these transfers, there was only one improvement built on these parcels, which consisted of a house constructed in 1989 on parcel 1. Mr. Fisher applied for the construction permit for this house, and upon its completion he moved into the house and continued to reside therein until his imprisonment in 1993. The fair market value of

the three parcels transferred on June 6, 1991, including the house built in 1989, was $69,000 as of that date.[4]

Mr. Fisher and his former wife, Alice A. Fisher, originally obtained title to parcel 1 sometime in 1984. On November 15, 1984, Mr. and Mrs. Fisher borrowed $10,000 from North Florida National Bank. This loan was secured by a mortgage on parcel 1. Under the terms of this loan, Mr. and Mrs. Fisher promised to pay $244.38 per month for 5 years.

Mr. and Mrs. Fisher were divorced in 1985. The Circuit Court for Leon County, Florida, issued a Final Judgment of Dissolution of Marriage on April 26, 1985. As part of this judgment, Mrs. Fisher was awarded the house and property located at 5741 Donnesbury Way, Tallahassee, Florida, in which Mr. and Mrs. Fisher were residing prior to the divorce.[5] Mr. Fisher was awarded parcel 1 located at 6913 Apalachee Parkway.

On June 10, 1988, Mr. Fisher executed a real estate mortgage on parcel 1 to secure his indebtedness of $10,937.46 to C & S Family Credit, Inc. On September 14, 1988, Mr. Fisher executed a mortgage on parcel 1 to secure his indebtedness of $21,875.03 to C & S Family Credit, Inc. On February 10, 1989, Mr. Fisher

---

[4]The 2-acre improved parcel with the house had a fair market value of $59,000, and the remaining two parcels had a fair market value of $10,000 together.

[5]Mr. and Mrs. Fisher had approximately $30,000 in equity in this property at the time of their divorce.

executed a mortgage on parcel 1 to secure an initial advance of $35,000 from Government Employees Credit Union of Florida.

Mr. Fisher obtained title to parcel 2 on January 25, 1990. The record is not clear regarding when Mr. Fisher obtained title to parcel 3. On February 19, 1990, Mr. Fisher executed a mortgage on parcels 1 and 3 to Real Estate Financing, Inc. (REFI), to secure a loan in the original amount of $53,877. The REFI mortgage was the only encumbrance against the three parcels as of June 6, 1991. The amount of unpaid principal on the REFI loan as of June 6, 1991, the date the three parcels were transferred to petitioners, was $51,871.

Subsequent to the transfer to petitioners on June 6, 1991, Mr. Fisher continued to reside in the house on parcel 1 and continued to make payments on the REFI loan. During the 6-month period following the transfer, Mr. Fisher paid off the outstanding balance on the REFI loan in its entirety. The following amounts were paid to REFI by Mr. Fisher:

| Date | Amount |
|------|--------|
| 06/17/91 | $600.00 |
| 07/16/91 | 600.00 |
| 07/23/91 | 202.10 |
| 08/13/91 | 600.00 |
| 09/10/91 | 600.00 |
| 09/18/91 | 109.22 |
| 10/11/91 | 20,582.27 |
| 10/29/91 | 678.74 |
| 10/29/91 | 27,903.53 |
| 11/19/91 | 433.83 |
| 12/05/91 | 3,619.88 |

Total            $55,929.57

Petitioners did not pay any consideration for the real property that Mr. Fisher transferred to them on June 6, 1991, or for any of the subsequent loan payments made by Mr. Fisher to REFI.

Transfers of Cash

Between December 3, 1991, and March 14, 1992, Mr. Fisher sent six checks to petitioners, which totaled $81,917.67.[6] These checks were drawn from the bank accounts into which Mr. Fisher had put diverted telephone commissions. Of the $81,917.67 in checks from Mr. Fisher, two checks in the amounts of $13,620.80 and $13,822.68 were not honored because of insufficient funds in Mr. Fisher's accounts. Therefore, the total amount deposited by petitioners into their joint account was $54,474.19. Shortly after these checks were deposited into petitioners' account, Mr. Fisher directed Mrs. Griffin to return some of the proceeds to him and to his designees. The total amount ($40,016.22) returned by petitioners between December 23, 1991, and March 13, 1992, was:

| Date | Payee | Money Order No. | Amount |
|------|-------|-----------------|--------|
| 12/23/91 | Rodger Fisher | T1908127 | $15,000.00 |
| 02/03/92 | Elizabeth Bollema | T1908442 | 500.00 |

---

[6]During this time, petitioners were living in the State of Arizona.

| | | | |
|---|---|---|---:|
| 02/03/92 | Lucious Little | T1908443 | 7,500.00 |
| 02/03/92 | Sandra Clary | T1908444 | 7,500.00 |
| 03/13/92 | Rodger Fisher | T1908860 | 9,516.22 |
| Total | | | $40,016.22 |

Respondent contends that petitioners retained $14,457.97 ($54,474.19 less $40,016.22) from the checks received from Mr. Fisher.

## Subsequent Transfers by Petitioners

Petitioners made the following payments by check or cashier's checks during 1992:[7]

| Date | Payee | Check No. | Amount |
|---|---|---|---:|
| 08/05/92 | Roosevelt Randolph | 3517 | $3,500 |
| 08/05/92 | Thomas Brown | 3518 | 3,500 |
| 08/11/92 | Rodger Fisher | 3521 | 2,500 |
| 08/11/92 | Ameritrust Co. National Association | 570 | 4,500 |
| 10/14/92 | Thomas Brown | 3622 | 3,500 |
| 10/14/92 | Roosevelt Randolph | 3623 | 3,500 |
| Total | | | $21,000 |

### OPINION

Section 6901(a) provides a procedure whereby taxes owed by a transferor may be collected from a transferee. Commissioner v.

---

[7]Petitioners contend that payments to Mr. Fisher, and to others on his behalf, should be considered in determining their liability as transferees. In their brief, petitioners contend that the total amount retransferred to Mr. Fisher and his designees was $17,500 and refer to the exhibit reflecting the six checks totaling $21,000.

Stern, 357 U.S. 39, 42-47 (1958); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993). Section 6901 does not create or define a transferee's liability. Commissioner v. Stern, supra at 42-43; Hagaman v. Commissioner, supra. For purposes of this case, the existence and extent of a transferee's liability, at law or in equity, is determined by State law.[8] Commissioner v. Stern, supra at 44-45; Hagaman v. Commissioner, supra at 183-185. Thus, State law determines the elements of liability, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability. Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), affg. 35 T.C. 1148 (1961). Respondent bears the burden of proving petitioners' liability as transferees. Sec. 6902(a); Rule 142(d).

Respondent calculated the extent of petitioners' transferee liability by adding the individual values of the property Mr. Fisher conveyed to petitioners as follows:

| Property | Value as determined by respondent |
|---|---|
| Real property located at 6913 Apalachee Parkway less outstanding mortgage | $17,129 |
| Mortgage payments made by Mr. Fisher, subsequent to 6/6/91, including interest | 55,930 |
| Checks | 14,457 |
| Total | $87,516 |

---

[8]There are some situations where the existence and extent of transferee liability is a matter of Federal law. See, e.g., sec. 6324(a)(2) and (b).

A.  Transfers of Real Property and Mortgage Payments

Florida law is applicable to the transfers of the three parcels of land located in Tallahassee, Florida.  Under Florida's Uniform Fraudulent Transfer Act (FUFTA), a transfer is fraudulent as to present and future creditors if the debtor made the transfer "With actual intent to hinder, delay, or defraud any creditor of the debtor".  Fla. Stat. Ann. sec. 726.105(1)(a) (West 1988).  Fla. Stat. Ann. sec. 726.105(2) (West 1988), provides:

> (2)  In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:
>
> (a)  The transfer or obligation was to an insider.
>
> (b)  The debtor retained possession or control of the property transferred after the transfer.
>
> (c)  The transfer or obligation was disclosed or concealed.
>
> (d)  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (e)  The transfer was of substantially all the debtor's assets.
>
> (f)  The debtor absconded.
>
> (g)  The debtor removed or concealed assets.
>
> (h)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

- 12 -

(i)  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j)  The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k)  The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Several of these listed factors are present here.

Mr. Fisher transferred his interests in the disputed parcels of land by warranty deeds on June 6, 1991, to his sister and brother-in-law, who are "insiders" for the purposes of FUFTA.[9] See Fla. Stat. Ann. sec. 726.102(7) (West 1988).  Mr. Fisher retained possession and control of the house that was built in 1989 on one of the parcels.  He continued to live there until his imprisonment in 1993 and continued to make payments on the loan which encumbered the property.[10]  Petitioners paid no consideration in exchange for Mr. Fisher's transfer of the three parcels.  Finally, the transfer of the parcels occurred after Mr. Fisher took the first step in his diversion scheme and shortly

---

[9]The close relationship of the transferee to the transferor tends to establish a prima facie case of a fraudulent conveyance which must be then met by the taxpayer.  Money v. Powell, 139 So. 2d 702 (Fla. Dist. Ct. App. 1962).

[10]Retention of possession of the property after the transfer creates a prima facie presumption of fraud.  Jones v. Wear, 149 So. 345 (Fla. 1933).

before he received the first illegal diversion of telephone commissions and incurred the related tax liabilities.[11]

The above factors support respondent's argument that Mr. Fisher intended to defraud his creditors. Once respondent establishes the prima facie case of transferee liability, it is incumbent upon petitioners to come forth and present evidence in rebuttal. Nau v. Commissioner, 27 T.C. 999, 1000-1001 (1957), affd. in part and revd. in part 261 F.2d 362 (6th Cir. 1958). Petitioners contend that the three parcels were originally purchased by Mr. Fisher with petitioners' money and that they were always the equitable owners of the three parcels. In essence, petitioners are arguing for a resulting trust.[12] The burden of proving a resulting trust rests with petitioners. Powell v. Race, 10 So. 2d 142 (Fla. 1942).

The burden of establishing the existence of a resulting trust is a heavy one. In Foster v. Thornton, 179 So. 882, 891 (Fla. 1937), the court held that a resulting trust in real estate

---

[11]Regardless of when Federal taxes are actually assessed, taxes are considered as due and owing, and constitute a liability, no later than the date the tax return for the particular period is required to be filed. Hagaman v. Commissioner, 100 T.C. 180, 188 (1993).

[12]A resulting trust arises as a matter of law where property is acquired in the name of one person or entity with consideration provided by others. Under Florida law, once a party proves that he paid the purchase price for a piece of property, a presumption arises that it was the parties' intention that the individual holding legal title was to hold the property in trust for the payor. Maliski v. Maliski, 664 So. 2d 341, 342-343 (Fla. Dist. Ct. App. 1995).

may be proved by parol testimony, but such proof must be "full and clear."

> "Evidence to establish a resulting trust must be so clear, strong, and unequivocal as to remove from the mind of the Chancellor every reasonable doubt as to the existence of the trust."  [Id. (quoting Geter v. Simmons, 49 So. 131, 133 (Fla. 1909)).]

> "When a resulting trust is sought to be established by parol evidence, the burden rests upon the person asserting the existence of the trust to remove every reasonable doubt as to its existence by clear, strong, and unequivocal evidence."  [Id. (quoting Brown v. Brown, 143 So. 737, 738 (Fla. 1932)).]

We find that petitioners have not met their burden of producing such evidence.

It is undisputed that legal title to the real property was held by Mr. Fisher at all times prior to the transfer to petitioners on June 6, 1991.[13]  However, petitioners claim to have advanced $4,000 in cash for a downpayment on parcel 1 purchased in 1984, made mortgage payments on a $10,000 loan that Mr. and Mrs. Fisher made in their own names, and also to have contributed an undisclosed amount of capital via credit card purchases of supplies and other materials used in the construction of the house built on parcel 1 during 1988.  These contentions are not supported by any documentation in the record.  Petitioners failed to produce any canceled checks, money orders,

---

[13]Mrs. Fisher's name was on the title of parcel 1 for a short period of time.

credit card receipts, bank statements, or any other documentation which would corroborate their argument.

Petitioners, instead, rely on their own testimony and that of Mr. Fisher and his former wife, Alice. However, this testimony is contradicted by other evidence. For example, the amount of monthly mortgage payments that petitioners claim to have made to Mr. Fisher do not correspond to the original loan from North Florida National Bank in 1984. Petitioners claim to have made monthly payments of $350 for approximately 1-1/2 years, whereas the North Florida National Bank loan required monthly payments of $244.38 for 5 years. Additionally, Mr. Fisher executed several loans secured by mortgages on the property. In each instance, Mr. Fisher purported to be the true owner. Mr. Fisher also applied for the construction permit which authorized the construction of the house on parcel 1 during 1988. Finally, during Mr. and Mrs. Fisher's divorce proceedings, parcel 1 was treated as marital property and awarded to Mr. Fisher.

Mr. Fisher's actions were consistent with true ownership. Petitioners failed to present documentation corroborating their payment for the property. Petitioners have not presented clear, strong, and unequivocal evidence of a resulting trust. Indeed, the preponderance of the evidence supports a finding that Mr. Fisher was the owner of the property prior to June 6, 1991.

The fair market value of the property transferred on the date of transfer must be determined to find the extent of

- 16 -

transferee liability.  <u>Gumm v. Commissioner</u>, 93 T.C. 475, 480 (1989), affd. without published opinion 933 F.2d 1014 (9th Cir. 1991); <u>Stokes v. Commissioner</u>, 22 T.C. 415, 428 (1954). Respondent presented the report and testimony of Harry J. Smith, who valued the real property transferred to petitioners at $69,000, as of June 6, 1991.  Mr. Smith's valuation of the subject property consists of two components: (1) The house built during 1989 and parcel 1 upon which the house was built, which were valued together at $59,000;[14] and (2) parcels 2 and 3, which were valued together at $10,000.  We find Mr. Smith's valuation persuasive.[15]

At the time the real property was transferred to petitioners, it was encumbered by a mortgage.  The balance of the loan secured by this mortgage was $51,871 on the date of transfer.  For purposes of determining petitioners' transferee liability, the fair market value of the real property must be reduced by the outstanding mortgage against the property.  <u>Stokes v. Commissioner</u>, <u>supra</u>.  Therefore, we find that the value of the real estate interest transferred to petitioners on June 6, 1991, was $17,129 ($69,000 less $51,871).

_____

[14]Petitioners argue that Mr. Smith valued a house built in 1992, rather than the house that existed at the time of the transfer.  We do not find this argument persuasive.  In valuing the real property, Mr. Smith relied on the property appraiser records for Leon County, Florida, which reflect information regarding the house built in 1989.

[15]Petitioners did not present any evidence regarding the fair market value of the real property in question.

During the 6-month period following June 6, 1991, Mr. Fisher completely paid off the REFI loan secured by the mortgage. The total amount Mr. Fisher paid during this period was $55,929.57.[16] As each payment was made by Mr. Fisher on the loan, the mortgage lien was correspondingly reduced, and petitioners realized a proportionate increase in their equity in the property. Under FUFTA, a transfer is broadly defined as including "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Fla. Stat. Ann. sec. 726.102(12) (West 1988). Each payment made by Mr. Fisher on the loan satisfies the broad definition of a "transfer" under Florida law. Petitioners did not pay any consideration for the release of this encumbrance. Based upon our reasoning regarding the transfer of the real property itself, we find that these transfers were made with the same fraudulent intent. See supra pp. 11-12. Therefore, we find that petitioners received transfers with a total value of $55,929.57, by way of Mr. Fisher's payment of the REFI loan.

---

[16]The difference between the balance of the unpaid principal of the loan as of June 6, 1991, in the amount of $51,871, and the total amount paid by Mr. Fisher over the 6-month period following the transfer on June 6, 1991, of $55,929.57, was due to interest and other charges accruing on the loan.

B.  Transfers of Cash

In addition to the fraudulent transfer of real property and the payments Mr. Fisher made on the loan, respondent contends that the $14,457.97 retained by petitioners in the circular movement of money for Mr. Fisher also was a fraudulent transfer. Petitioners failed to provide any substantive argument as to why this transfer was not fraudulent.  However, in their answering brief, petitioners, for the first time, contend that respondent's focus on Florida law regarding their liability for these transfers may be misplaced.

Petitioners suggest that Arizona law might apply because they resided in the State of Arizona when the transfers of cash took place.  Arizona, like Florida, adopted the Uniform Fraudulent Transfer Act, which was effective during the years in issue.  See Ariz. Rev. Stat. Ann. secs. 44-1001 to 44-1010 (West 1994).  Petitioners have not demonstrated any difference between Arizona's version of the Uniform Fraudulent Transfer Act and Florida's version of the same act.  Further, our review of these two statutes reveals no significant differences in their language as applicable to the facts of this case.  Therefore, our determination of petitioners' transferee liability regarding the receipt of cash would be the same under either State's law.

As with the transfers of the real property and the payment of the loan, there are several factors present in the transfer of

cash which demonstrate fraud for purposes of FUFTA. During the period from December 3, 1991, through March 14, 1992, Mr. Fisher transferred $14,457.97 to petitioners for which they paid no consideration. Fla. Stat. Ann. sec. 726.105(2)(h) (West 1988). Petitioners are insiders for purposes of FUFTA. Fla. Stat. Ann. sec. 726.105(2)(a) (West 1988). In addition, Mr. Fisher created several fictitious entities in order to carry out and later conceal the telephone commissions that he diverted from the State of Florida. Mr. Fisher transferred some of the telephone commissions to petitioners by checks drawn on the accounts opened in the names of these fictitious entities. Petitioners transferred some of these funds back to Mr. Fisher through the use of money orders payable to Mr. Fisher and to others that he designated. These actions are indicative of Mr. Fisher's intent to conceal these assets. Fla. Stat. Ann. sec. 726.105(2)(g) (West 1988). Finally, the transfers of cash occurred shortly before Mr. Fisher incurred a substantial tax liability. Fla. Stat. Ann. sec. 726.105(2)(j) (West 1988). Together, these factors demonstrate Mr. Fisher's intent to hinder, delay, or defraud his creditors. Fla. Stat. Ann. sec. 726.105(1)(a) (West 1988).

C. Subsequent Transfers by Petitioners

Petitioners contend that, even if they are held liable as transferees, the amount of their liability should be reduced by

their payment of credit card bills and attorney's fees and by the value of the two smaller unimproved parcels which they transferred to the United States in accordance with Mr. Fisher's plea agreement.

A transferee may avoid liability for a tax deficiency under a fraudulent transfer statute by reconveying the property to the transferor under certain conditions. Mendelson v. Commissioner, 52 T.C. 727, 735 (1969); see also Eyler v. Commissioner, 760 F.2d 1129, 1134 (11th Cir. 1985), affg. in part and revg. in part T.C. Memo. 1983-397. A transferee may avoid liability as a fraudulent transferee by reconveying or retransferring the property to the transferor prior to the Commissioner's taking action to collect from the transferee. Eyler v. Commissioner, supra at 1134. A transferee who pays the debts of his transferor, however, will not be relieved of liability to the extent of the payment unless the debts paid held priority over the tax claimed by the Commissioner.[17] Id. Petitioners bear the burden of refuting transferee liability once the Commissioner has made a prima facie showing of such liability. Ginsberg v. Commissioner, 35 T.C. 1148, 1156-1157 (1961), affd. 305 F.2d 664 (2d Cir. 1962).

---

[17]We note that whether a reconveyance to the transferor relieves the transferee of liability is a matter of State law. McLellan v. Commissioner, T.C. Memo. 1975-15. The parties have pointed us to no Florida (or Arizona) cases which would provide for a contrary result on these facts.

1.  Transfers Directly to Mr. Fisher

Except for the $40,016.22 previously allowed by respondent, the only retransfer of property that petitioners made directly to Mr. Fisher was the $2,500 check dated August 11, 1992. Respondent acted to collect from petitioners when the notice of transferee liability was issued on July 7, 1994. Because the $2,500 payment occurred before July 7, 1994, we find that the amount of transferee liability asserted by respondent should be reduced to the extent of $2,500.[18]

2.  Transfers to Mr. Fisher's Creditors

Petitioners contend that the remaining transfers of cash to Ameritrust Co. National Association, Mr. Randolph, and Mr. Brown,[19] and the transfer of the two parcels to the United States

_____

[18]Respondent contends that petitioners and Mr. Fisher conspired to defraud Mr. Fisher's creditors. In Gobins v. Commissioner, 18 T.C. 1159, 1174 (1952), affd. 217 F.2d 952 (9th Cir. 1954), we noted that in certain cases it is possible that retransfers "might be the result of collusion between the parties and made in such manner that it also would be in fraud of creditors." Despite the fact that Mr. Fisher and petitioners were closely related, there is no evidence of collusion on the part of petitioners with regard to the retransfer of $2,500 on Aug. 11, 1992.

[19]Petitioners do not identify the respective relationships of these payees to Mr. Fisher or the purposes of these payments. However, respondent identified the payees, Mr. Randolph and Mr. Brown, as Mr. Fisher's attorneys. Respondent also identified the payee, Ameritrust Co. National Association, as a creditor of Mr. Fisher; however, there is nothing in the record that would

(continued...)

were made in Mr. Fisher's behalf. However, petitioners do not offer any proof or make any argument to show that the debts and fees paid on Mr. Fisher's behalf or that the transfer of the two parcels of land in accordance with Mr. Fisher's plea agreement had priority over his indebtedness to respondent. Transferee liability having been established, it is incumbent upon petitioners to make such a showing. Gobins v. Commissioner, 18 T.C. 1159, 1174 (1952), affd. 217 F.2d 952 (9th Cir. 1954). Accordingly, petitioners' claim that they are relieved of liability by reason of the expenditures made by them on Mr. Fisher's behalf is rejected.

To the extent petitioners have raised other issues or arguments, we have fully examined them and find them to be without merit. Summarizing our conclusions, then, we hold that petitioners are liable as transferees for Mr. Fisher's income tax deficiencies and additions to tax for 1991 and 1992 to the extent of $85,016 ($87,516, as determined by respondent, less the $2,500 retransferred to Mr. Fisher), plus interest on such amount as provided below.

---

[19](...continued)
indicate whether this creditor (or any other creditor) had priority over respondent.

D.  Liability for Interest

Where the amount transferred to a transferee is less than the amount of taxes owed by the transferor, State law determines the extent to which a transferee is liable for interest accrued prior to the Commissioner's demand for payment.  Estate of Stein v. Commissioner, 37 T.C. 945, 961 (1962).  Florida gives respondent the right to statutory interest on petitioners' transferee liability.  LeBeau v. Commissioner, T.C. Memo. 1992-359.  Under Florida law, prejudgment interest is allowed in cases involving a liquidated claim.  Town of Longboat Key v. Carl E. Widell & Son, 362 So. 2d 719, 723 (Fla. Dist. Ct. App. 1978).  Mr. Fisher's unpaid tax deficiency and addition to tax for 1991 was $93,030, which was due and owing no later than April 15, 1992.  Because the value of the assets transferred to petitioners was less than this liability, all of respondent's claim against petitioners became liquidated no later than April 15, 1992.  Petitioners' transferee liability includes accrued interest at the rate prescribed under Fla. Stat. Ann. sec. 55.03 (West 1988) from April 15, 1992.

Decision will be entered under Rule 155.