T.C. Memo. 2002-314

UNITED STATES TAX COURT

WILLIAM T. BUTLER, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JOSEPH P. MCGRAW, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 2265-00, 2385-00.        Filed December 27, 2002.

<u>Gregory J. Klint</u> and <u>Douglas R. Boettge</u>, for petitioner
William T. Butler.

<u>Nicky R. Hay</u>, for petitioner Joseph P. McGraw.

<u>John C. Schmittdiel</u> and <u>Melissa J. Hedtke</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  By notices of liability dated November 30,
1999, respondent determined deficiencies, additions to tax, and

penalties relating to Metro Refuse, Inc.'s (Metro) tax years

ending June 30, 1988 through 1990 (hereinafter tax years 1988

through 1990) as follows:

Metro Refuse, Inc.

Additions to tax and penalty

| Year | Deficiency | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6653(b) | Sec. 6661 | Sec. 6663 |
|------|-----------|-------------------|-------------------|--------------|-----------|-----------|
| 1988 | $112,324 | $83,393.25 | 50% of the interest due on $111,191 | -- | -- | -- |
| 1989 | 186,457 | -- | -- | $136,207.50 | $46,614.25 | -- |
| 1990 | 160,854 | -- | -- | -- | -- | $14,889.75 |

Unless otherwise indicated, all section references are to

the Internal Revenue Code in effect for the years in issue, and

all Rule references are to the Tax Court Rules of Practice and

Procedure.

The issue for decision is whether petitioners are liable as

transferees in equity for $1,946,292 relating to Metro's Federal

income tax liability, additions to tax, penalties and interest,

as of December 31, 1999.

FINDINGS OF FACT

In 1964, William Butler (Butler) began working in the waste

disposal industry as a truck driver.  In 1969, he incorporated

Metro, a waste disposal company servicing commercial customers in

the Minneapolis/St. Paul metropolitan area (Twin Cities area).

In 1983, Metro hired Joseph McGraw (McGraw) as its general

manager, and, in 1988, he became president and chief financial

officer.  His duties related to personnel, financial management,

accounting, equipment acquisition, marketing, sales, and tax return preparation. On June 30, 1988, Butler transferred to McGraw a minority interest in Metro.

In the 1970s, Metro began hauling waste to Burnsville Sanitary Landfill (Burnsville), which was owned by Ed Kraemer & Sons, Inc. (Kraemer & Sons) (i.e., Rudy, Victor, and David Kraemer's construction company). Burnsville sent Metro monthly invoices, and Metro paid these invoices by check. Robert Miller (Miller), Kraemer & Sons' Minnesota division manager, negotiated the prices for all Burnsville customers.

Sometime before the years in issue, Butler, Miller, and Richard Wybierala began participating in two schemes that diverted Metro funds to Butler. Richard and Alice Wybierala owned Poor Richards, Inc. (Poor Richards), another Twin Cities area waste disposal company. Poor Richards did not have the equipment necessary to empty trash containers that required a front-end loader. Butler agreed to have Metro service all of Poor Richards's front-end loader customers in exchange for a portion of the fees Poor Richards collected on those accounts. Butler periodically submitted to Poor Richards invoices summarizing the front-end loading subcontract work performed by Metro. Poor Richards wrote checks payable to Metro or Village Sanitation, Inc. (a defunct waste hauler). But, rather than deliver the checks to Metro, Richard Wybierala (Wybierala) cashed

them and delivered most or all of the proceeds to Butler. McGraw knew of this scheme and did not report these funds on Metro's corporate tax returns for the years in issue.

Under another scheme, which began in 1987, Butler directed McGraw to issue weekly Metro checks to Poor Richards in amounts less than $10,000. Although Poor Richards did not perform any services, these checks were recorded on Metro's general ledger as subcontract work and deducted on Metro's corporate tax returns. Wybierala routinely cashed the checks and delivered the funds to Butler, while McGraw generated vouchers and gave them to Metro's accounts payable staff.

Neither Metro nor Butler kept records detailing the cash Butler received under these diversion schemes. Butler gave some of the cash to Miller, a Kraemer & Sons employee, who, in turn, lowered Metro's dumping fees. Paying cash to landfill operators in exchange for lower dumping fees was not a common practice in the Twin Cities area, and other Burnsville customers did not make such payments.[1]

Saliterman, Ltd. (Saliterman), a certified public accounting practice owned by Mark Saliterman, performed, with McGraw's assistance, yearend reviews of Metro's financial statements and prepared Metro's Federal and State income tax returns.

---

[1] Pursuant to Minn. Stat. Ann. sec. 609.86 (West Supp. 2002), a generally enforced statute, commercial bribery is a crime.

Saliterman was not aware of, and McGraw and Butler did not inform Saliterman about, the diversion schemes. During the years in issue, McGraw supervised the preparation of Metro's Forms W-2, Wage and Tax Statement, and Forms 1099-MISC, Miscellaneous Income, which he knew did not reflect the funds diverted to Butler, and signed Metro's tax returns, which he knew did not accurately reflect Metro's income and deductions. McGraw did not know the total amount of cash Butler kept for himself or, with the exception of Butler's payments to Miller, how the diverted cash was spent.

In 1990, respondent audited Metro's 1988 and 1989 tax years. McGraw failed to disclose to the auditor that there were income omissions and fictitious subcontract expenses. McGraw subsequently consulted with Attorney Peter Thompson (Thompson), who insisted that Metro properly classify all its income and expense items and not file another false tax return.

On September 14, 1990, Saliterman sent McGraw Metro's 1990 Federal and State income tax returns. Shortly before Metro filed its 1990 returns on March 19, 1991, McGraw, acting pursuant to the advice of Thompson, called Saliterman and instructed them to reduce the expense for subcontract services by $400,873 and report that amount as officer's compensation. Despite Thompson's advice, McGraw did not instruct Saliterman to include on the 1990

return amounts Butler received from Poor Richards for front-loading subcontract services.

Metro's 1990 tax returns reflect that Butler and McGraw received compensation of $1,006,330 and $156,900, respectively. Metro did not report the reclassified $400,873 on Butler's Forms 1099 or W-2 or on Metro's employment tax returns and did not pay or withhold employment taxes on it. Butler did not report that amount on his individual income tax returns.

In early 1990, Butler and McGraw began negotiations to sell Metro to Browning Ferris Industries, Inc. (BFI). On August 31, 1990, Browning Ferris Industries of Minnesota, Inc. (BFIM), agreed to purchase Metro. BFIM exchanged 212,233 common shares of BFI, BFIM's parent, for Metro's assets in a transaction intended to be a tax-free merger pursuant to section 368.

The merger agreement provided that Metro could not transfer the BFI stock to Butler and McGraw until BFI issued financial statements showing the combined operations of Metro and BFI. On December 4, 1990, BFI transferred 141,489 shares of its stock to Butler and 70,744 shares to McGraw, consistent with their respective 67- and 33-percent interests in Metro. BFI stock was traded publicly on the New York Stock Exchange, and on December 4, 1990, BFI stock's mean sale price was $21.875.[2]

---

[2] See Meyer v. Commissioner, 46 T.C. 65, 106 (1966) (holding that "Where stock is listed * * * on a recognized

(continued...)

In 1991, the State of Minnesota audited Metro.  McGraw did not disclose to the State auditor, and the auditor did not discover, the income omissions or fictitious expenses.  Metro was dissolved on December 11, 1991.

In 1995, David Kraemer discovered that Miller had received kickbacks from Metro and filed suit, on behalf of Kraemer & Sons, against Wybierala and Butler for unpaid dumping fees.

On June 28, 1995, Butler pled guilty to violating section 7206(2) relating to Metro's 1988 return (i.e., aiding and abetting the filing of a false corporate return), and section 7206(1) relating to his 1988 individual return (i.e., filing a false personal income tax return).  Butler admitted knowing that Metro's 1988 return did not include all of Metro's taxable income and agreed to pay $1.5 million toward his individual, and Metro's, tax liabilities.  In 1997, Miller pled guilty to violating section 7201 for failing to report cash received from Butler (i.e., presenting a false or fraudulent return).

On November 30, 1999, respondent issued petitioners notices of liability in which respondent determined that petitioners, as transferees of Metro, are liable for $1,946,292.38 of corporate

[2](...continued)
exchange, the mean price between the * * * [high and low] trading prices on a given date is * * * the fair market value for that date."), revd. on other grounds 383 F.2d 883 (8th Cir. 1967).

income tax, statutory additions, and interest relating to Metro's tax years 1988 through 1990.

When they filed their petitions, Butler resided in Cape Coral, Florida, and McGraw resided in Mahtomedi, Minnesota.

### OPINION

Respondent contends that Metro underpaid its tax liability for tax years 1988 through 1990; the underpayments were due to petitioners' fraudulent actions as officers of Metro; and petitioners, as transferees of Metro's assets, are liable for Metro's tax liabilities pursuant to section 6901. Petitioners contend that there was no underpayment of tax attributable to the conduct of Metro officers, and that the period of limitations relating to Metro's tax years 1988 through 1990 expired.

I.   Statute of Limitations, Deficiency Determination, and Fraud
     Penalty

"In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time."  Sec. 6501(c)(1); see also sec. 6901(c)(1). Respondent must establish by clear and convincing evidence that for each year in issue an underpayment of tax exists and some portion of the underpayment is due to fraud.  See Rule 142(b); Ballard v. Commissioner, 740 F.2d 659 (8th Cir. 1984), affg. in part and revg. in part T.C. Memo. 1982-466; Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).

A.   Underpayment of Tax

1.   Metro's Omitted Income

Respondent determined the amount of Metro's omitted income by compiling checks written by Poor Richards to Metro and Village Sanitation.  See sec. 446(b) (authorizing the Commissioner to reconstruct a taxpayer's income where the taxpayer fails to maintain adequate records).  Petitioners contend that the worksheets used to bill Poor Richards, as summarized by McGraw, more accurately reflect income to Metro.

The worksheets were incomplete and not compiled contemporaneously with Butler's receipt of the diverted funds. Accordingly, we sustain respondent's determinations relating to the amounts of income omitted from Metro's returns.

2.   Metro's Alleged Deductions

Petitioners concede that Metro underreported subcontract income during the years in issue, Metro overstated its subcontract expense in 1988 and 1989, and all of the funds related to the underreporting and overstatement were diverted to Butler.  Petitioners contend, without supplying any contemporaneous documentary evidence or third-party testimony, that all funds diverted to Butler were used to pay Metro's ordinary and necessary business expenses (e.g., cash payments for lower dumping fees, black-market truck parts, compensation to Butler and other Metro employees, etc.).  See Franklin v.

Commissioner, T.C. Memo. 1993-184 (placing the burden of production on the taxpayer insofar as the taxpayer's defense to fraud is premised on offsetting deductions).

### a.   Cash Payments to Miller

The cash payments to Miller were not ordinary expenses because they were not "normal, usual, or customary", and the transactions which gave rise to these expenses were not "of common or frequent occurrence in the type of business involved." See Deputy v. Dupont, 308 U.S. 488, 495 (1940); United Draperies v. Commissioner, 41 T.C. 457, 463 (1964), affd. 340 F.2d 936 (7th Cir. 1964).  Petitioners have not established that other Burnsville customers paid cash in exchange for lower dumping fees, or that such payments were a common practice in the Twin Cities area.  Thus, the cash payments are not deductible.  See Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, section 162(c)(2) disallows deductions for payments that constitute "an illegal bribe, illegal kickback, or other illegal payment" under a "generally enforced" State law.  Minn. Stat. Ann. sec. 609.86 (West Supp. 2002), a generally enforced State law, prohibits commercial bribery.  See sec. 1.162-18(b)(3), Income Tax Regs. Thus, pursuant to section 162(c)(2), no deduction is permitted for the cash payments to Miller.

### b. Miscellaneous Expenses

Petitioners contend that Butler, after paying Miller, spent the remaining funds on Metro-related expenses. Petitioners, however, give no specific account as to why, when, or how much of the diverted funds were used to pay Metro expenses. Accordingly, Metro is not entitled to deductions for these alleged expenses.

### c. Officer's Compensation

Petitioners' alternative contention is that all funds diverted to Butler are deductible by Metro as officer's compensation. Payments are deductible, however, only when they are intended as compensation. See King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 514 (1992). The testimony and documentary evidence establish, and we conclude, that Metro did not intend these payments to be compensation.

Petitioners' concessions, that Metro omitted income and overstated deductions, and our holding that Metro is not entitled to offsetting deductions establish Metro's underpayment of tax for tax years 1988 through 1990.

### B. Fraud

Fraud is established by proof of intent to evade tax believed to be owing. See Clayton v. Commissioner, 102 T.C. 632 (1994). A corporation is liable for fraud if its officer has the fraudulent intent to evade the corporation's taxes. DiLeo v.

Commissioner, 96 T.C. 858, 875 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Beck v. Commissioner, T.C. Memo. 2001-270.

Metro's two officers, Butler and McGraw, both concede their participation in the two schemes that led to the misrepresentations on Metro's tax returns, which McGraw signed. Metro's accounting department, under Butler's orders and McGraw's supervision, did not keep books and records relating to the funds diverted to Butler. McGraw caused Metro to file an incorrect return even after his attorney told him to report the income accurately. During Metro's 1990 and 1991 tax audits, neither Butler nor McGraw informed the Federal or State taxing authorities about the income omissions and deduction overstatements. Participants in the schemes primarily dealt in cash, and any checks used to facilitate the schemes were written for less than $10,000 to avoid Internal Revenue Service scrutiny.

Petitioners contend that they believed Metro's returns did not reflect an underpayment because Butler used the diverted funds to pay Metro's expenses. We disagree. McGraw, Metro's chief financial officer, readily acknowledged that, when Metro's return was filed, he did not know how much Butler was receiving nor what he was doing with the money. McGraw knowingly participated in both schemes by accounting for, and causing Metro to deduct, fictitious subcontract expenses. In addition, Butler pled guilty to violating section 7206 for aiding and abetting the

filing of a false corporate return and willfully underreporting income relating to his 1988 and 1989 tax returns.

The evidence is clear and convincing that Metro's underpayment of tax was attributable to the fraudulent actions of its officers, McGraw and Butler. See Davis v. Commissioner, T.C. Memo. 1991-603 (holding that the Commissioner may prove intent to evade tax by circumstantial evidence); see also, e.g., Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992) (evidence of fraud may include substantial understatement of income, inadequate books and records, failure to cooperate with tax authorities, dealing in cash, implausible explanations of conduct given at trial, and participation in or concealment of illegal activities).

We reject petitioners' contention that, in filing Metro's returns, petitioners relied in good faith on the advice of Metro's outside accountants. There is no evidence that Metro's outside accountants knew that Butler and McGraw conspired to omit income and deduct fictitious subcontract expenses. Even if Metro's outside accountants, having knowledge of all the relevant facts, had instructed petitioners to omit Metro's income and deduct fictitious subcontract expenses, such advice would have been so clearly wrong that we could not find that petitioners relied upon the advice in good faith. See LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without

published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Cordes Fin. Corp. v. Commissioner, T.C. Memo. 1997-162, affd. without published opinion 162 F.3d 1172 (10th Cir. 1998). Accordingly, the period of limitations has not expired, and Metro is liable for the deficiencies in its income taxes, the section 6653 additions to tax for fraud, and the section 6663 fraud penalty.

## II. Transferee Liability

Stockholders who have received the assets of a dissolved corporation may be held liable for unpaid corporate taxes. Sec. 6901; Phillips v. Commissioner, 283 U.S. 589, 593 (1931). Respondent has the burden of establishing transferee liability. Rule 142(d); sec. 6902. Pursuant to section 6901(a), respondent may establish petitioners' liability in equity if a basis exists under applicable Minnesota law for holding petitioners (i.e., the transferees) liable. See Commissioner v. Stern, 357 U.S. 39, 42-47 (1958).

### A. Respondent Established a Prima Facie Case in Equity

Respondent established that, on December 4, 1990, petitioners knew Metro underpaid its tax liabilities for tax years 1988, 1989, and 1990, and petitioners received, without consideration, liquidating distributions from Metro totaling $4,642,597 (i.e., Butler's 141,489 BFI shares plus McGraw's

70,744, multiplied by the $21.875 share price).  Thus, the debtor made the transfer without receiving a reasonably equivalent value in exchange, and the debtor became insolvent as a result of the transfer.  See Minn. Stat. Ann. secs. 513.45 (West 2002), 302A.557 (West 1985).  Metro's tax liability for those years remains unpaid.  Accordingly, respondent has established a prima facie case of equitable transferee liability.  See Gumm v. Commissioner, 93 T.C. 475 (1989).

Respondent relied on section 513.45 of Minnesota's Uniform Fraudulent Transfer Act (UFTA), Minn. Stat. Ann. sec. 513.45, to establish that Metro was rendered insolvent by the distribution of BFI stock, and accordingly, the distribution was fraudulent. Petitioners contend that respondent erred by relying on the UFTA to determine whether the transfer was fraudulent rather than section 302A.551 of the Minnesota Model Business Corporation Act (MBCA), Minn. Stat. Ann. sec. 302A.551 (West 1985), to determine whether the distribution was illegal.

Section 513.45 of UFTA provides that a transfer is fraudulent as to a present creditor if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor became insolvent as a result of the transfer.  Minn. Stat. Ann. sec. 513.45.  Similarly section 302A.551, subdivision 1, of the MBCA provides that a distribution is illegal if the corporation is unable "to pay its

debts in the ordinary course of business after making the distribution". Minn Stat. Ann. sec. 302A.551, subdiv. 1.

Respondent has established that Butler and McGraw caused Metro to avoid paying taxes they knew to be owing. Scott v. Commissioner, 117 F.2d 36 (8th Cir. 1941); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993). The liquidating distribution to petitioners, for which Metro did not receive anything in exchange from petitioners, rendered Metro insolvent (i.e., unable to pay those taxes in the ordinary course of business). Accordingly, the distribution was a fraudulent transfer pursuant to section 513.45 of the UFTA, and illegal pursuant to section 302A.551 of the MBCA. We conclude that petitioners' liability is established pursuant to either statute.

Petitioners also contend that several Minnesota statutes of limitation (Minn. Stat. Ann. secs. 541.05 (West Supp. 2002), 302A.557, and 302A.7291 (West Supp. 2002)) bar respondent's tax claims. We disagree. Minnesota statutes of limitations are inapplicable to transferee proceedings governed by section 6901. See Phillips v. Commissioner, supra; see also Dillman v. Commissioner, 64 T.C. 797 (1975).

B. Petitioners' Rebuttal of Respondent's Prima Facie Case

Petitioners contend that, pursuant to section 302A.557, subdivision 1, of the MBCA, petitioners' liability is limited to $459,635 of tax, $323,000 of penalties, and interest accrued as

of December 4, 1990. Petitioners contend that they are not liable for any interest accruing after the date of the transfer of assets (i.e., December 4, 1990). We disagree. There is no authority for petitioners' position. On December 4, 1990, Butler and McGraw received BFI stock worth $3,095,072 and $1,547,525, respectively. These amounts were obviously in excess of Metro's tax liability on that date (i.e., est. $1,100,000). "In cases where the transferred assets exceed the total liability of the transferor, the interest being charged is upon the deficiency, and is therefore a right created by the Internal Revenue Code." Estate of Stein v. Commissioner, 37 T.C. 945, 961 (1962); Lowy v. Commissioner, 35 T.C. 393, 397 (1960). Accordingly, petitioners' liability with respect to interest on Metro's tax liability is determined pursuant to Federal law (i.e., section 6601).

Petitioners contend, without citing any authority, that the BFI stock they received should be valued at a 40-percent discount because the tax-free characterization of Metro's merger with BFIM would have been destroyed had they sold their stock on December 4, 1990. This contention is unpersuasive. A willing buyer would not be concerned whether the seller recognizes gain as a result of the exchange. See Stanko v. Commissioner, 209 F.3d 1082, 1086 (8th Cir. 2000) (holding that the proper approach to valuation is to determine what a willing buyer would have paid for the

property (citing <u>United States v. Cartwright</u>, 411 U.S. 546, 551 (1973))).

Petitioners contend that their liability should be reduced because they allegedly paid $538,883 of Metro's liabilities after Metro's BFI stock was distributed to them. Petitioners' testimony, however, was devoid of any particulars relating to the allegedly paid expenses. In addition, petitioners have not established that the allegedly paid liabilities had priority over respondent's claim relating to tax liabilities. See <u>Hutton v. Commissioner</u>, 59 F.2d 66 (9th Cir. 1932), affg. 21 B.T.A. 101 (1930); <u>Gobins v. Commissioner</u>, 18 T.C. 1159, 1174 (1952), affd. per curiam 217 F.2d 952 (9th Cir. 1954). Accordingly, we reject petitioners' contention. McGraw contends that his transferee liability should be reduced because Butler, in his 1995 criminal plea, agreed to pay Butler's and Metro's tax liabilities. Each transferee, however, is liable to the extent he received property without adequate consideration. <u>Phillips v. Commissioner</u>, 283 U.S. at 603; <u>Scott v. Commissioner</u>, <u>supra</u>. McGraw also contends respondent did not take reasonable steps to collect the tax liability from Metro. We reject this contention also. Metro was dissolved in 1991. The Commissioner is not required to proceed against a dissolved corporation before asserting transferee liability against its stockholders. <u>Maher v. Commissioner</u>, 469

F.2d 225 (8th Cir. 1972), affg. in part and remanding in part 56 T.C. 763 (1970).

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.