# United States Court of Appeals
## For the First Circuit

No. 13-1717

GEORGE SCHUSSEL, Transferee,

Petitioner, Appellant,

v.

DANIEL I. WERFEL, Acting Commissioner of the
Internal Revenue Service,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES TAX COURT
[Hon. Mary Ann Cohen, Judge, U.S. Tax Court]

Before

Thompson, Stahl, and Kayatta,
Circuit Judges.

Francis J. DiMento, with whom Jason A. Kosow and DiMento
& Sullivan were on brief, for appellant.
Regina S. Moriarty, Attorney, Tax Division, Department of
Justice, with whom Richard Farber, Attorney, Tax Division,
Department of Justice, and Kathryn Keneally, Assistant Attorney
General, were on brief, for appellee.

July 8, 2014

**KAYATTA, Circuit Judge**. George Schussel appeals a decision of the United States Tax Court holding him liable, as the recipient of a fraudulent transfer from his former company, for the company's back taxes (including penalties) of over $4.9 million, plus interest of at least $8.7 million. On appeal, he does not dispute that his company fraudulently transferred millions of dollars to him in an effort to avoid paying income taxes to the IRS. What he disputes is how much he owes the IRS as a result of those transfers. First, he argues that the tax court erred in applying the federal tax interest statute, and that he should only have to pay the likely much lower amount of prejudgment interest that would be due under Massachusetts law. Second, he claims that the tax court should have accepted his corrected tax returns as establishing the amount of the assets he misappropriated. Third, he maintains that he should have received credit for money he loaned back to his company, which the company then used to pay his legal bills. Concluding that the tax court calculated prejudgment interest under the wrong statute, we affirm in part, reverse in part, and remand for further proceedings.

## I. Background

We have previously recounted George Schussel's efforts to circumvent U.S. tax law, affirming his convictions for tax evasion and conspiracy to defraud the United States. See United States v. Schussel, 291 F. App'x 336 (1st Cir. 2008). We recount the basics

here, adding only the details necessary to resolve this appeal (most of which were stipulated by the parties).

Beginning in the early 1980s, Schussel operated a Massachusetts corporation called Digital Consulting, Inc. ("DCI"). Until 1996, DCI was a subchapter C corporation.[1] During the relevant period, Schussel controlled 95% of DCI.[2] Schussel set up an offshore shell company to siphon DCI income into accounts that he controlled, all without paying the requisite corporate or individual taxes. DCI failed to report all of its income to the IRS, and eventually, the IRS issued a notice of deficiency regarding DCI's 1993, 1994, and 1995 tax returns. DCI neither contested nor paid the assessed liabilities. It has been insolvent since 2004.

As we explain below, the IRS can, by statute, collect a person's tax debt by reclaiming assets the debtor has transferred to someone else (a "transferee"). See 26 U.S.C. § 6901. On November 24, 2010, the IRS sent Schussel a notice of liability ("Notice"), claiming that he was liable as a transferee for DCI's 1993-1995 tax deficiencies. The Notice claimed that DCI had tax deficiencies of $1,796,477.71, $2,596,817.21, and $3,878,275.77 for

---

[1] In 1996, DCI became a subchapter S corporation. It was later converted into a Massachusetts business trust, and its name was changed to the Driftwood Massachusetts Business Trust. We refer simply to "DCI" for clarity.

[2] Schussel testified that he owned 90% and his wife 5%, but that he controlled all 95%.

-3-

those three years "as shown in the attached statement," and that "[t]his portion of total assessed income tax deficiencies, plus interest as provided by law, constitute your liability as transferee . . . ." In summary, the attached statement provided:

| | 1993 | 1994 | 1995 |
|---|---|---|---|
| DCI Tax Assesed | $622,455.00 | $889,445.00 | $1,321,449.00 |
| Fraud Penalty | $466,841.25 | $667,083.75 | $991,086.75 |
| Interest | $2,249,268.11 | $2,752,369.18 | $5,467,439.66[3] |
| DCI Funds Diverted to Schussel | $2,044,106.00 | $2,522,944.00 | $4,356,279.00[4] |

The statement also said that, of DCI's tax liability, "only $2,044,106.00, $2,522,944.00 and $4,356,279.00 [i.e. the amounts transferred] for these respective tax years, plus interest as provided by law from the date of this notice, will be assessed against George Schussel as transferee . . . ." (These sums, not including interest, add up to $8,923,329.) A note at the base of the page explained that Schussel was:

> liable for the lesser of the value of the property transferred, plus interest as provided by law, or the balance of the liability, plus accrued interest. Accordingly, the transferee's liability for the 1993, 1994 and 1995 assessed liability of the transferor is limited to the above stated value of property transferred to him for the three years.

---

[3] The parties later stipulated that the $5 million interest figure was incorrect.

[4] The "1995" transfers to Schussel occurred in 1995-1997.

-4-

Schussel challenged the Notice in tax court, claiming (among other things) that he should receive credit against any transferee liability for money that he loaned back to DCI. Most of that money, Schussel readily admits, DCI used to cover expenses related to his tax litigation.[5] According to the stipulated facts and evidence at trial, DCI's gross receipts, legal and consulting expenses, and loans from Schussel amounted to:

| Year | Gross Receipts | Legal | Consulting | Loans |
|------|------|------|------|------|
| 2001 | $26,773,417 | $34,152 | $513,440 | $500,000 |
| 2003 | $12,325,807 | $21,288 | $522,000 | $200,000 |
| 2004 | $4,615,479 | $1,034,291 | $0 | ($75,000) |
| 2005 | $0 | $477,709 | $0 | $549,194 |
| 2006 | $0 | $409,391 | $0 | $187,900 |
| 2007 | $0 | $543,790 | $0 | $77,132 |
| 2008 | $0 | $35,866 | $0 | $585,747 |
| 2009 | $0 | $22,835 | $0 | $37,167 |
| 2010 | $0 | $2,834 | $0 | $4,646 |

The IRS's answer to Schussel's petition for review asked that the Notice of Liability simply be confirmed. However, its later-filed pretrial memorandum abandoned the limited theory of Schussel's liability for interest advanced in the Notice and Statement. Instead, it argued that Schussel was liable for DCI's

---

[5] Not all of the money came out of a DCI account; some appears to have come from accounts of other companies run by Schussel. He claims, however, that these expenditures were attributed to DCI for accounting purposes.

back taxes, plus interest as determined under the federal tax interest statute from the due date of DCI's tax returns, and that his liability was not limited to the amount of assets that DCI fraudulently transferred to him.[6]

After trial, the tax court ruled on a large number of issues, only a few of which are relevant to this appeal. As pertinent here, it first determined that Schussel received from DCI fraudulent transfers in the amounts of $2,044,106 during 1993, $2,522,944 during 1994, and $4,356,279 during 1995 to 1997, for a total of $8,923,329. Then, at the IRS's request, the court held Schussel liable for DCI's back taxes, plus prejudgment interest at the federal rate from the respective dates on which DCI's income taxes were due for 1993, 1994, and 1995.[7] So calculated, prejudgment interest alone totaled approximately $8.7 million by the time the IRS issued the Notice, leaving Schussel liable for over $13.6 million plus further accruing interest at the federal rate. Finally, the tax court refused to give Schussel credit against his liability for the amount he loaned back to DCI from 2001 to 2010, or to limit his liability to the amount of assets he received (no matter how that figure was calculated).

_____

[6] The tax court evidently accepted this shift, and although Schussel mentions the shift in his brief, he does not directly challenge its allowance.

[7] By statute and regulation, the federal rate varies over time.

Schussel timely appealed, Fed. R. App. P. 13(a)(1), challenging each of those conclusions. First, he argues that his total liability should have been limited to $7,358,394, the undeclared income figure the IRS used to correct his individual tax returns, or at most to the $8.9 million of DCI assets that the IRS's Notice and Statement claimed he received. Second, he contends that any prejudgment interest on the fraudulently transferred funds should have been assessed at the Massachusetts rate of 12% per year, but only from the date of the 2010 IRS Notice rather than the dates on which DCI's unpaid taxes were due in 1993-1995, resulting in a substantial reduction in his total liability. Third, he argues that he should receive credit, to be counted against his liability, for roughly $2.1 million in loans he made to DCI between 2001 and 2010.

We have jurisdiction under 26 U.S.C. § 7482. We address each of Schussel's arguments, assessing first the question of interest, then the amount transferred, and then whether Schussel should receive credit for any alleged retransfers.

## II. Standard of Review

Our review of the tax court's ruling is "in most respects similar to our review of district court decisions: factual findings for clear error and legal rulings de novo." Drake v. Comm'r, 511 F.3d 65, 68 (1st Cir. 2007); see also 26 U.S.C. § 7482(a)(1), (c)(1). "The clear error standard of review extends to factual

findings based on inferences from stipulated facts." Capital Video Corp. v. Comm'r, 311 F.3d 458, 463 (1st Cir. 2002) (internal quotation marks omitted).  "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Interex, Inc. v. Comm'r, 321 F.3d 55, 58 (1st Cir. 2003) (internal quotation marks omitted).  Although the burden is usually on the taxpayer to demonstrate that an IRS ruling is wrong, in transferee cases the IRS bears the burden of showing that the petitioner "is liable as a transferee of property of a taxpayer, but not [of showing] that the taxpayer was liable for the tax."  26 U.S.C. § 6902(a); see generally U. S. Tax Ct. R. 142(a), (d).[8]

---

[8]  Tax Court Rule 142 provides:
The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court . . . .  In any case involving the issue of fraud with intent to evade tax, the burden of proof in respect of that issue is on the respondent . . . by clear and convincing evidence. . . .  The burden of proof is on the respondent to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.

# III. Analysis

## A. The Tax Court Applied the Wrong Framework to Assess How Much Schussel Owes.

### 1. The Fraudulent Transfer Claim

In its effort to recover sums transferred to Schussel by DCI, the IRS availed itself of the procedures set forth in 26 U.S.C. § 6901. Section 6901 specifies the procedures by which the IRS may administratively assert (among other claims) state law remedies for fraudulent transfers, subject to challenge in tax court.[9] While the procedures are federal, state substantive law controls in determining whether and to what extent the transferee is liable. See Frank Sawyer Trust of May 1992 v. Comm'r, 712 F.3d 597, 602-03 (1st Cir. 2013).[10] Here, nearly all of the transfers are covered by the now-repealed Massachusetts Uniform Fraudulent Conveyance Act ("MUFCA"). Mass. Gen. Laws ch. 109A, §§ 1 et seq. (1995). The few made after October 1996 fall under the Massachusetts Uniform Fraudulent Transfer Act ("MUFTA"). Id. §§ 1 et seq. (2014).

---

[9] Section 6901 provides, as most relevant here, that "[t]he amount[]" of "[t]he liability, at law or in equity, of a transferee of property" "of a taxpayer" "shall . . . be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." 26 U.S.C. § 6901(a).

[10] There is a federal fraudulent transfer law, see 28 U.S.C. § 3304, but neither party suggests that the government has invoked it here. See generally id. § 3002(2) (excluding the tax court from the definition of "court" for that chapter).

Schussel did not appeal the tax court's finding that the transfers in this case were made with the actual intent to defraud DCI's creditors--specifically, the IRS. Therefore, the transfers are invalid both as to creditors with claims against DCI at the time of the transfer and as to those whose claims arose later. See id. § 7 (1995); id. § 5(a)(1) (2014).

Both the MUFCA and MUFTA generally permit a creditor with a matured claim to avoid a fraudulent conveyance (i.e., secure a return of the transferred funds in favor of the creditor) "to the extent necessary to satisfy his claim." David v. Zilah, 325 Mass. 252, 256 (1950); Mass. Gen. Laws ch. 109A, § 8(a)(1), § 9(b), (c) (2014) (allowing avoidance "to the extent necessary to satisfy the creditor's claim," but limiting the judgment to the lesser of a) the amount of the claim, and b) the value of the assets "adjusted" "as the equities may require"); 48A Jordan L. Shapiro et al., Massachusetts Practice: Collection Law § 14:57 (3d ed. 2000) (describing remedies under the MUFCA). Each statute gives the court some discretion to fashion an equitable remedy in some cases. See Mass. Gen. Laws ch. 109A, § 8(a)(3)(iii) (2014) (subject to section 9, allowing "any other relief the circumstances may require"); id. § 10(d) (1987) (allowing courts to "[m]ake any order which the circumstances of the case may require" to protect creditors with immature claims).

## 2.  Interest

In discussing the issues raised by this appeal, it is helpful to distinguish between interest accrued on the tax obligation of the taxpayer-transferor, and interest accrued on the transferred funds recovered from the transferee by a creditor. Federal interest on a tax obligation accrues automatically, usually from the date when the tax payment first becomes late.  26 U.S.C. § 6601(a), (e).[11]  That interest is simply a part of the debt owed by the taxpayer-transferor to the IRS, see § 6601(e), all of which may usually be collected from a fraudulent transferee to the extent of the amount fraudulently transferred.  See, e.g., Lowy v. Comm'r, 35 T.C. 393, 394 (1960); cf. also United States v. Verduchi, 434 F.3d 17, 21-22 & n.6, 25 (1st Cir. 2006) (under Rhode Island fraudulent transfer law--but not section 6901--treating the IRS's claim against the transferor as including the accumulated interest).  Thus, for example, if the taxpayer owes $100 in taxes, upon which $30 in interest accrues, and the taxpayer then

---

[11]  Section 6601 provides that, generally, "[i]f any amount of tax imposed by this title . . . is not paid on or before the last date prescribed for payment, interest on such amount at [the federally-set rate] shall be paid for the period from such last date to the date paid."  26 U.S.C. § 6601(a).  Generally, that interest has to be paid upon notice and demand, and almost any reference in the tax code to a "tax" must be read to include section 6601 interest.  Id. § 6601(e)(1).

fraudulently transfers $150 to a transferee, the IRS can certainly recover a judgment of no less than $130 against the transferee.[12]

What is at issue in this case is prejudgment interest asserted against the transferee on the amount of the transfer deemed to be avoidable (that is, the amount that the transferee must give back). Suppose, again, that a taxpayer owed $100 in taxes and accrued $30 in interest; but, this time, he transferred $101 to a third-party transferee. The transferee would be liable for a judgment that he pay over to the IRS the entire $101 transferred to him. Like most other litigants against whom a monetary liability is established, he might also owe some amount of prejudgment interest--the question is how much.

According to the IRS, it depends on when the interest accrued. If, as in our example, it accrued before the taxpayer transferred the $101 (so that on the day of transfer, the taxpayer owed more to the IRS than he gave away to the transferee), the IRS concedes that state fraudulent transfer law would apply to limit the IRS to recovering from the transferee the $101 he received, plus such prejudgment interest as might be available under that state law. But if the additional interest owed by the taxpayer to

---

[12] Moreover, even in a case where the interest did not accrue until after the date of the transfer, the government would seem to be able to recover the $30, at least where, as here, the transferor's actual fraudulent intent renders the transfer invalid as to both present and future creditors. Mass. Gen. Laws ch. 109A, § 7 (1995); id. § 5(a)(1) (2014).

the IRS accrued after the transfer (so that on the day of transfer, the taxpayer gave away more than he owed at that time), the IRS claims that the transferee would owe the entire $30 in interest accrued under federal law. That interest, it says, accrued on the transferee's own liability (not just on the taxpayer's underlying debt) and ran under section 6601 at the same rate and from the same date as against the original taxpayer on the underlying tax debt. Essentially, the IRS argues that where state law provides the basis for transferee liability, the ratio of IRS debt to assets transferred on the date of transfer operates as a toggle switch to pick whether state or federal law controls prejudgment interest.

The language of the two statutes is sufficiently abstract that it could be read as providing partial support for the IRS. Under section 6901, transferee liability is to be assessed and collected "in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." 26 U.S.C. § 6901(a). And the tax interest statute, section 6601, provides that "[a]ny reference in this title [except for in the subchapter relating to deficiency procedures] to any tax imposed . . . shall be deemed also to refer to interest imposed by this section on such tax." Id. § 6601(e)(1). There is some appeal, therefore, in the IRS's claim that section 6601 is simply one of the same tax "provisions and limitations" to which transferee liability is subject under

-13-

section 6901.  See Robinette v. Comm'r, 139 F.2d 285, 288 (6th Cir. 1943) (so holding, before the Supreme Court ruled in Comm'r v. Stern, 357 U.S. 39 (1958), that state law governs the substance of fraudulent transferee liability under section 6901); cf. Nicholas v. United States, 384 U.S. 678, 690-91 (1966) (interpreting the similarly-worded 26 U.S.C. § 7501 to mean that where a Chapter 11 bankruptcy trustee was not liable for interest on the debtor's taxes after a certain point, a trust fund collectable in the same manner as those taxes would not garner interest); Baptiste v. Comm'r, 29 F.3d 1533, 1541-42 (11th Cir. 1994) (where a federal statute created the transferee liability, concluding that "subject to the same provisions and limitations" in section 6901 means that the IRS can charge interest on transferee liability "as if it were a tax liability").[13]

Statutory history can also be read as providing some support for the (more limited) idea that interest accrues at the federal rate from the date of the transfer.  The original draft of section 6901's precursor, section 280 of the Revenue Act of 1926, 44 Stat. 61 (1926), specified that no interest would accrue on a

---

[13]  To avoid any confusion, we note that the tax court's opinion in Baptiste was appealed to two circuit courts.  Those courts reached conflicting conclusions about whether a transferee, liable under federal law for estate taxes, could owe more than he had received.  Compare Baptiste, 29 F.3d at 1541-42 (yes), with Baptiste v. Comm'r, 29 F.3d 433, 437 (8th Cir. 1994) (no).  The Baptiste cases dealt with substantive transferee liability created and limited by federal law rather than state law; we express no opinion on their outcomes.

transferee's liability until he received a notice and demand. S. Rep. No. 69-52 (1926), <u>reprinted in</u> 1939-1 Cum. Bull. (Pt. 2) 354-55. In conference, that language was changed; the committee asserted that section 280 did not alter the extent of transferee liability, but went on to add that no interest accrued on the transferee's assumed liability after the transfer, except interest "for failure to pay upon notice and demand . . . and interest at 6 per cent a year for reimbursing the Government at the usual rate for the loss of the use of the money due it." H.R. Rep. No. 69-356, at 44 (1926)(Conf. Rep.), <u>reprinted in</u> 1939-1 Cum. Bull. (Pt. 2) 371-73.[14] This might suggest that Congress expected a standard federal interest rate to apply, and did not view that choice as much altering existing transferee liability law. But as a number of cases point out, it is hardly crystal clear.[15]

---

[14] The 1926 act included several different interest rates; for example, taxpayers owed six percent per year on tax deficiencies, increasing to one percent per month after the IRS sent a notice and demand for payment. Revenue Act of 1926, ch. 27, §§ 274(j), 276(b), 44 Stat. 9, 56-58 (1926). Thus it is unclear whether the reference in the legislative history to "the usual rate" of six percent refers to the deficiency rate, <u>see</u> <u>Poinier</u> v. <u>Comm'r</u>, 858 F.2d 917, 921 (3d Cir. 1988) (concluding so), or just anticipated that an equitable grant of interest might adopt a rate used elsewhere in the Act. <u>Cf.</u> <u>Billings</u> v. <u>United States</u>, 232 U.S. 261, 286 (1914) (affirming the IRS's entitlement to interest); <u>cf. also</u> <u>Leighton</u> v. <u>United States</u>, 289 U.S. 506, 509 (1933) (affirming, as not an abuse of discretion, interest awarded against a corporation's transferee-stockholders at six percent per year from the date of the assessment against the corporation. <u>See</u> <u>Leighton</u> v. <u>United States</u>, 61 F.2d 530, 534 (9th Cir. 1932)).

[15] <u>See</u> <u>Patterson</u> v. <u>Sims</u>, 281 F.2d 577, 580 n.4 (5th Cir. 1960) (noting that the legislative history "seems to indicate that the United States is entitled to interest accruing after the

Ultimately, we are saved from having to search for an answer in ambiguous statutory language and unclear legislative history. Instead, we find our answer in the U.S. Supreme Court's interpretation of a prior version of this same statute. In Commissioner v. Stern, 357 U.S. 39 (1958), the Supreme Court held that another of section 6901's predecessor statutes, section 311 of the Internal Revenue Code of 1939, 26 U.S.C. § 311 (1939), provided only the procedure by which the IRS could assert substantive rights against transferees created by other laws--it did not create any such rights. Stern, 357 U.S. at 42-45. Thus, where, as there, state fraudulent transfer law supplied the substantive rule, state law controlled "the existence and extent of [transferee] liability." Id. at 45. Although the statutory language has changed some since then,[16] the parties agree that Stern still

transfer, if under state law a transferee would be so liable to a private creditor"); Estate of Stein v. Comm'r, 37 T.C. 945, 961 n.18 (1962) ("The legislative history, although not of sufficient clarity for judicial reliance, tends to support the running of interest on transferee liability from the date of transfer, although in 1926 the issue resolved in [Stern] was not considered."); cf. Poinier, 858 F.2d at 922 (rejecting the early 20th century history as unhelpful because the various interest provisions were later combined into section 6601).

[16] The key language of section 311 read:
The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter (including the provisions in case of delinquency in payment after notice and demand. . .): (1) TRANSFEREES.--The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest,

-16-

controls, and requires that state law dictate the existence and extent of Schussel's transferee liability.

In turn, both Massachusetts and federal courts treat prejudgment interest as a substantive part of a state-law remedy. See, e.g., Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 146 (1st Cir. 2009) (in a discrimination case, noting that "[i]t is well established that prejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court"); Militello v. Ann & Grace, Inc., 411 Mass. 22, 26 & n.4 (1991) ("[A]n award of prejudgment interest is a substantive remedy."). Since section 6901 governs only procedure, and since prejudgment interest is generally a matter of substance, it follows that section 6901 does not govern prejudgment interest where the substantive law is state law.

Resisting this conclusion, the IRS points to several cases in which the IRS was in fact able to recover prejudgment interest under federal law. But it offers little authority expressly adopting its position--that is, few state-law-based transferee cases where a court held that because the transferor gave away more than he owed to the IRS that day, section 6601 interest runs on the transferee's liability from the date that the transferor's taxes were due, even though that interest has grown

_____

additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter.
26 U.S.C. § 311, 53 Stat. 1, 90 (1939).

-17-

the debt well beyond what the transferee received (and regardless of when the transferee learned about the debt). And even those few cases it identifies offer little informative analysis. See Upchurch v. Comm'r, 100 T.C.M. (CCH) 85 (2010) (under Illinois estate transferee liability rules, where the transferee received more than the estate owed as a deficiency but less than the deficiency plus interest, concluding that interest ran under section 6601 on the transferee's liability for the deficiency from the date the estate tax return was due); see also Nat'l Pneumatic Co. v. United States, 176 Ct. Cl. 660, 666 (1966) (where the assets transferred were adequate to satisfy the total taxes, penalties, and interest, describing the interest charged as upon the transferee's liability, rather than the transferor's tax debt); Butler v. Comm'r, 84 T.C.M. (CCH) 681 (2002) (in a case applying Minnesota fraudulent transfer law, explicitly comparing the roughly $4.6 million transferred with the transferor's $1.1 million tax liability on the date of the transfer).

On the whole, the weight of the case law is consistent with the basic logic of our Stern analysis. This precedent includes two of the cases upon which the IRS itself relies, Estate of Stein v. Commissioner, 37 T.C. 945 (1962), and Lowy v. Commissioner, 35 T.C. 393 (1960). In Lowy, the tax court explained that federal law determines "the quantum of" the IRS's claim against the taxpayer-transferor, and that that claim includes

statutory interest. 35 T.C. at 395 (interpreting the 1939 code). Therefore, where the assets in the hands of the transferee were "more than ample to discharge the full Federal liability of the transferor (including interest)," there was no need to resort to state-law interest principles to make the IRS whole. See id. at 397. Here, of course, the IRS would not be made whole by recovering the funds transferred to Schussel because DCI's debt, including penalties and interest, was larger than the amount transferred. This type of situation was presented in Estate of Stein, where the tax court explained that because the transferred assets were "insufficient to pay the transferor's total liability, interest is not assessed against the deficiencies because the transferee's liability for such deficiencies is limited to the amount actually transferred to him. Interest may be charged against the transferee only. . . [as] determined by State law." 37 T.C. at 961. Accord, e.g., Stanko v. Comm'r, 209 F.3d 1082, 1087-88 (8th Cir. 2000) (in a constructive fraudulent transfer case, rejecting an argument similar to the IRS's here as unsound under Nebraska law); Stansbury v. Comm'r, 102 F.3d 1088, 1089, 1092 (10th Cir. 1996) (where the transferees received less than the transferor's "total amount owed to the IRS," concluding that under Stern their interest liability before receiving a notice was governed by state law); Patterson v. Sims, 281 F.2d 577, 580 (5th Cir. 1960) (where the taxpayer's liability, even before interest,

exceeded the transferee's net benefit, concluding that the transferee's substantive liability was controlled by state law, and using state law to assess the "liability of a transferee in addition to the value of the property received").

We therefore accept the IRS's invitation to follow <u>Lowy</u> and <u>Estate of Stein</u>, but we follow the actual reasoning of the opinions in those cases, not the caricature of them reflected in the IRS's position. The resulting rule, we believe, is consistent with <u>Stern</u>'s mandate that Massachusetts law dictate Schussel's substantive liability. <u>Stern</u>, 357 U.S. at 45. That rule is simple: The IRS may recover from Schussel all amounts DCI owes to the IRS (including section 6601 interest accruing on DCI's tax debt), up to the limit of the amount transferred to Schussel, with any recovery of prejudgment interest above the amount transferred to be determined in accord with Massachusetts law.[17] This rule, in our view, appropriately defers to Massachusetts fraudulent transfer law and avoids the arbitrary effects of the government's focus on the ratio of the debt to the transferred assets on the date of transfer. Our comfort with this conclusion is buttressed by (but not predicated on) the fact that the IRS itself appears to have

---

[17] Thus, the IRS will recover from Schussel the penalties and interest owed to the IRS by DCI to the extent the funds fraudulently transferred to Schussel exceeded DCI's unpaid taxes.

taken a similar approach in non-precedential guidance.[18] Similarly, the Notice of Liability in this very case tracked that guidance, rather than the position the IRS later advanced at trial and on appeal.

Schussel contends, and the IRS does not dispute, that under Massachusetts law, no interest would have begun to accrue

---

[18] See Internal Revenue Service, Chief Counsel Advisory 200916027 (April 17, 2009) ("If the asset transferred exceeds the transferor's liability on the date of transfer, interest under 6601 continues to run from the date of transfer until the earlier of exhaustion of the value of the asset or the beginning of interest on the transferee's liability. . . . If the value of the asset exceeded the transferor's liability but has been exhausted and time still remains before interest begins to run on the transferee's liability, state law may impose interest from the point of exhaustion of the value of the assets until interest begins to run on the transferee's liability."); Internal Revenue Service, Chief Counsel Advisory 200915038 (April 10, 2009) ("Where the total value of assets transferred exceeded the transferor's total liability on the date of transfer, and the excess of value of assets has been exhausted by the imposition of section 6601 interest but time remains in the second period, imposition of interest under state law may apply . . . ."); Internal Revenue Service, Chief Counsel Advisory 200851072 (Dec. 19, 2008) ("Where the total value of the transferred assets exceeds the transferor's total liability on the date of transfer, 6601 interest may be imposed for the second period until the value of the asset is exhausted. . . . [W]here the excess in value of assets transferred has been exhausted, state law may impose interest for the second period or remainder of the second period."); cf. United States v. Craft, 535 U.S. 274, 300 n.9 (2002) (Thomas, J., dissenting) (citing a variety of formal and informal IRS guidance, including a Chief Counsel Advisory).

until the date of the Notice of Liability.[19]  Cf. Mass. Gen. Laws ch. 231, § 6B (providing for prejudgment interest as of "the date of commencement of the action."); Lassman v. Keefe (In re Keefe), 401 B.R. 520, 527 (B.A.P. 1st Cir. 2009) (applying section 6B to a Massachusetts fraudulent transfer action in bankruptcy court).  We accept (without deciding) that uncontested description of Massachusetts law.  Schussel therefore owes no prejudgment interest on his own liability as transferee (that is, on the amounts transferred to him) for the time period pre-dating the Notice.

The reader might think (and hope) we are done with this interest(ing) issue, but this is tax law, and it should surprise no one that a bit more need be said regarding the subsequent period of time that passed between the Notice and the judgment (as opposed to the longer periods that passed between the due date of the tax and the issuance of the Notice, or between the date of the transfer and the Notice).  Section 6601 provides that when a tax is "not paid on or before the last date prescribed for payment," interest shall accrue, and that where the last date for payment is not prescribed

---

[19]  It may be that Massachusetts law contains some equitable principle that would allow interest to accrue earlier than that. Compare Stansbury, 102 F.3d at 1092 (where a transferee was intimately involved in the fraud, Colorado law let interest run from the date of the transfer), with, e.g., Wood v. Robbins, 11 Mass. 504, 506 (1814) (in an action for money had and received, "where the defendant obtained the plaintiff's money by fraud and imposition, interest ought to be allowed from the receipt of the money, and not merely from the service of the writ"). However, the IRS affirmatively waived the opportunity to challenge Schussel's characterization of Massachusetts law in its post-trial briefing.

anywhere else, that date "in no event shall be later than the date notice and demand for the tax is made by the Secretary." 26 U.S.C. § 6601 (a), (b)(5); cf. Internal Revenue Service, Chief Counsel Advisory 200848068 (Nov. 28, 2008) (noting that section 6901 does not prescribe a "last date" for the transferee to pay a tax and that a transferee's liability for the tax arguably arises upon the date of transfer, but that section 6601 imposes liability for interest on the transferee at least as of the date of notice and demand for payment of the transferee liability). This language suggests that "the question of prejudgment interest after the date of the Commissioner's notice of transferee liability . . . may well be a matter of federal law." Stanko, 209 F.3d at 1088. See also Patterson, 281 F.2d at 580.

Schussel, however, affirmatively volunteers that, from the date of the Notice until judgment, he is subject to prejudgment interest under Mass. Gen. Laws ch. 231, § 6B. And because the Massachusetts rate (twelve percent) exceeds the current federal rate (three percent), the IRS has had no cause to oppose Schussel's position that Massachusetts interest rules also apply to the period between the Notice and the judgment. See Mass. Gen. Laws ch. 231, § 6B; 26 U.S.C. §§ 6601(a), 6621; IRS Rev. Rul. 2014-11. Accordingly, on remand in this particular case, the "simple rule" stated above should control for the entire prejudgment time period,

with any prejudgment interest assessed above the amount transferred calculated at the Massachusetts rate from the date of the Notice.

**B.    How Much Did DCI Transfer to Schussel?**

We turn next to divining the size of the transfer. Schussel argues first that that amount is $7,358,394, which is the amount the IRS determined he received as constructive dividends from DCI when the IRS corrected his personal tax returns for 1993-1995.  In the alternative, he argues that the amount should be $8,923,329--the amount identified in the Notice of transferee liability (and adopted by the tax court).  The IRS did not cross-appeal, but claims (apparently as an alternate basis for affirmance) that the record shows that over the life of the scheme, Schussel used DCI to divert over $15 million to himself (not just the $8.9 million listed in the Notice).

Addressing first Schussel's arguments for limiting the amount deemed to have been fraudulently transferred to him to $7.3 million, we agree with the tax court that the constructive dividends determination is not controlling.  Schussel concedes that the $8.9 million figure represents the amount of DCI's gross receipts diverted from 1993 to 1997 into accounts that he controlled.  And on appeal, Schussel offers no sufficient explanation for why the amount of his constructive dividend income is also the correct measure of assets fraudulently transferred

under Massachusetts law.[20]  Accordingly, we see no error in the tax court's decision to accept as a proper measure of the assets he received during 1993-1997 the actual amount transferred from DCI into Schussel-controlled accounts as stipulated by the parties.

We turn next to the IRS's argument for increasing the amount deemed to have been transferred by DCI to Schussel.  The IRS argues that there is record evidence demonstrating that, in addition to the $8,923,329 transferred in 1993-1997, DCI also diverted roughly $6 million more to Schussel (largely comprised of amounts transferred to him before 1993.)  Assuming that these transfers were also made with fraudulent intent, Massachusetts law renders all of the money available to pay both prior and subsequent claims.  See David v. Zilah, 325 Mass. 252, 256 (1950).  Therefore, the IRS asks us to conclude that the amount transferred to Schussel was roughly $15 million.

The IRS's argument for using this increased figure confronts a nettlesome problem of notice and procedure--namely that

---

[20]  Schussel argues that the IRS took DCI's unreported income and then made "adjustments" to that amount to calculate the adjusted "dividend income" it attributed to him and his wife.  The only such adjustment that Schussel describes on appeal is for money paid to Ronald Gomes. The record suggests Schussel gave Gomes that money to keep him happy with the cash-diversion arrangement and so Schussel may well be ineligible to claim credit for those payments.  See generally Northborough Nat'l Bank v. Risley, 384 Mass. 348, 350-51 (1981).  In addition, more than $450,000 of the discrepancy appears to relate to assets transferred in 1996, which naturally would not appear on the Schussels' income tax adjustments for 1993-1995.

the IRS never (it seems) sought to amend its Notice of Liability or other pleadings to clearly warn Schussel that it would seek to use the $15 million figure. Cf. 26 U.S.C. § 6214(a) (granting the tax court jurisdiction to determine increases in deficiencies asserted at or before a hearing or rehearing); U.S. Tax Ct. R. 41 (specifying the procedure, much like Fed. R. Civ. P. 15, for amending pleadings). The Notice assured him that his liability was limited to $8,923,329 plus interest as provided by law. When Schussel filed his petition with the tax court challenging the liability imposed on him by the Notice, the IRS filed an answer, largely affirming the position taken in the Notice, but referring (without specific dollar amounts) to transfers dating back to 1988.

Apparently deciding (but not announcing) that it had erred in its more limited initial approach, the IRS's pretrial memorandum did indeed add allegations of additional transfers and diversions (with dollar figures) dating back to 1985. At trial, the IRS also offered evidence reflecting the alleged diversions from 1985 on. Schussel, for his part, objected to this awkward attempt to establish transfers in excess of those claimed in the Notice, although he failed to identify any prejudice the shift had caused him. In reply, the IRS asserted that it was not seeking, and need not seek, an increased deficiency (because DCI's underlying tax deficiency was the same as it has always been); it then simply asserted that it had amply proved the greater amount of

-26-

assets transferred to Schussel. The tax court never clearly addressed the issue, possibly because, by accepting the IRS's theory of prejudgment interest, the court pretty much affirmed a recovery that equaled the taxpayer-transferor's entire tax liability.

On appeal, the IRS again pays scant attention to the procedural niceties. Rather, it simply asserts that it proved transfers in the larger amount. Maybe so, but that is hardly the point. The point is that the record available to us on appeal contains neither a notice of liability, nor an amendment, nor a ruling under Tax Court Rule 41(b) that could provide a basis for affirming the decision of the tax court on the alternative $15 million figure now urged by the IRS. Cf. O'Rourke v. Comm'r, 73 T.C.M. (CCH) 2443 (1997) (explaining that the tax court cannot generally determine a greater deficiency than that listed in the Notice where the IRS has not pleaded such an increase); U.S. Tax Ct. R. 41. We therefore leave this entire question (i.e., whether the tax court may or should accept a belated motion to amend or consider any other available relief) to the discretion of the tax court on remand.

**C.    Schussel's Loans to DCI to Pay Schussel's Litigation Expenses Did Not Reduce the Net Amount Transferred to Him.**

Generally, a fraudulent transferee can reduce or eliminate his liability by returning the property to the original transferor before he receives a notice of transferee liability.

-27-

See <u>Eyler</u> v. <u>Comm'r</u>, 760 F.2d 1129, 1134 (11th Cir. 1985); <u>Ginsberg</u> v. <u>Comm'r</u>, 35 T.C. 1148, 1155-56 (1961), <u>aff'd</u>, 305 F.2d 664 (2d Cir. 1962); 14A <u>Mertens Law of Federal Income Taxation</u> § 53:11 (Thompson Reuters/West 2014).[21]

Even if there is no actual retransfer, a transferee might reduce his liability by showing that he used the property to pay the transferor's debts (at least if those debts had priority over the transferor's tax liability). <u>See, e.g.</u>, <u>Eyler</u> v. <u>Comm'r</u>, 53 T.C.M. (CCH) 308 (1987) and cases cited therein; 14A <u>Mertens Law of Federal Income Taxation</u> § 53:11 ("While a transferee who pays the debts of the transferor will not be relieved of liability to the extent of payment unless the debts paid held priority over the tax claimed by the Government, a transferee . . . [who] retransfers the property to the transferor can avoid liability as a fraudulent transferee.").

With these principles in mind, we turn to Schussel's claim that the tax court erred in denying him credit for just over

---

[21] Neither side addressed whether state or federal law controls this question, or cited to any Massachusetts law on point. Because it implicates the extent of transferee liability, we are inclined to conclude that under <u>Stern</u>, Massachusetts law controls. <u>See</u> <u>Griffin</u> v. <u>Comm'r</u>, 74 T.C.M. (CCH) 433 n.17 (1997). As neither party has pressed such a position, however, we follow their lead, noting that the result would likely be the same in any event. <u>Cf.</u> <u>Northborough Nat'l Bank</u> v. <u>Risley</u>, 384 Mass. 348, 350-51 (1981); <u>Modin</u> v. <u>Hanron</u>, 346 Mass. 629, 631 (1964); <u>Richman</u> v. <u>Leiser</u>, 18 Mass. App. Ct. 308, 314 (1984).

$2 million that he "loaned" to DCI between 2001 and 2010.[22]  Most of that money was used to pay expenses relating to Schussel's own criminal and civil tax cases.  Schussel argues that his legal costs were properly deductible as business expenses, suggesting that there is no irregularity in DCI paying them, and hence in his giving DCI money to do so.  The IRS objects that these were loans, not retransfers, and that the only point of the loans was to let Schussel count personal expenses as DCI expenses and maximize his tax deductions.  Although the IRS bears the burden of proof in transferee liability cases, see 26 U.S.C. § 6902(a), Schussel bore the burden "of going forward with the evidence . . . to refute transferee liability once the . . . [IRS] made a prima facie showing of such liability."  Eyler, 53 T.C.M. (CCH) 308 (citation omitted).

The tax court, siding with the IRS, evidently found that the "loan" transactions lacked economic substance.  It found that DCI was out of business when the loans were made, "had nothing to gain or lose by defending or not defending the charges," and never contested the tax deficiency.  Schussel v. Comm'r, 105 T.C.M. (CCH) 1223, at *7-8 (2013).  It held that "[t]he amounts loaned to the corporation were never available to pay its tax liabilities."  Id. at *7.  The tax court declined to address Schussel's arguments

---

        [22]   Schussel transferred $2,141,786 to DCI between 2000 and 2010, of which $75,000 was repaid in 2004, leaving a net "loan" to DCI of $2,066,786.

-29-

about whether the claimed expenses were deductible to either Schussel or DCI, or to apportion them between the two, deciding "only whether loans by petitioner to the corporation should reduce the transfer liabilities in issue;" it noted, however, that "recording loans to a defunct entity, paying expenses and deducting them on an S corporation return, and passing through the resulting losses to petitioner's personal income tax returns was simply a way to create the appearance that personal expenses were business expenses." Id. at *7-8. "In any event," the court noted, Schussel was bound by the contemporaneous characterization of these transactions as loans. Id. at *8. "In sum," the court found unjustified by "law or reason" the idea that Schussel's "liability as a transferee for corporate income taxes that he caused to be evaded should be reduced by the costs of defending himself from the consequences of his fraud." Id.

Schussel objects to the tax court's findings and conclusions on only two grounds. First, he attacks the court's observation that nothing in "law or reason" justified reducing Schussel's liability by the amount of his own legal fees. Not so, Schussel contends: precedent makes clear that legal defense costs related to one's business may be deductible as a business expense. See, e.g., Comm'r v. Tellier, 383 U.S. 687 (1966). While true, this helps him little. We view the tax court's remark as a passing comment upon the equities of the case--not as holding that

Schussel's suit-related expenses were per se nondeductible. This is especially clear in light of the tax court's explicit refusal to decide the deductibility question. This passing comment affords no basis for reversal.

Second, Schussel takes aim at the tax court's conclusion that the loaned funds were never available to pay DCI's tax bill, and its resulting refusal to apportion those expenses. Regardless of how the transfers were recorded on the corporate books, he argues, they put cash in DCI's accounts (or really, on its ledgers) which was then available to pay DCI's debts. Reading the court's analysis as a whole, however, we think that it justifiably concluded that there was no meaningful retransfer.

Viewed through the lens of federal tax doctrine (which the parties more or less invite by failing to cite any non-federal authority on point), the result is justified by the power to disregard the form of transactions that have no business purpose or economic substance beyond tax evasion. See Fidelity Int'l Currency Advisor A Fund, LLC ex rel. Tax Matters Partner v. United States, 661 F.3d 667, 670 (1st Cir. 2011) ("Tax considerations are permissibly taken into account by taxpayers . . . but where a transaction has no economic purpose other than to reduce taxes, the IRS may disregard the reported figures as fictions and look through to the underlying substance."). Why else would the tax court specify that the services paid for were rendered to Schussel

personally, or that DCI was out of business and had nothing to gain by defending the charges, before concluding that the loans were "not available" to pay DCI's debts?  (We note that Schussel offers no challenge to those first two findings.)  It thus appears that the tax court found no economic substance or business purpose for DCI in the loans, and that their only function was to manipulate tax liability.[23]  Cf. Bergersen v. Comm'r, 109 F.3d 56, 60 (1st Cir. 1997) (declining to credit the characterization of purported loans from a company to stakeholders, and instead treating them as dividends, where the effect of the whole transaction was to give the taxpayers "permanent tax-free control over the moneys" and repayment of the loans amounted to "a meaningless exchange of checks." (internal quotation marks omitted)).  We see no basis for disturbing the tax court's ruling on this point.

## IV.  Conclusion

For the foregoing reasons, the judgment of the tax court is **affirmed** in part and **reversed** in part, and the matter is **remanded** for further proceedings consistent with this opinion.  No costs are awarded.

---

[23]  Thus, this case differs from one in which a transferee might give the transferor general funds which were then paid out to other creditors.  When there is a genuine retransfer, the use to which those funds are then put by the original transferor does not bear on the liability of the original transferee.